**BI–RITE, Plaintiff,**

v.

**BUTTON MASTER, Defendants.**

**Nos. 81 Civ. 5642 (ADS), 81 Civ. 5840 (ADS).**

United States District Court, S.D. New York.

Aug. 15, 1983.

**MEMORANDUM AND ORDER**

SOFAER, District Judge.

In an opinion dated January 14, 1983, 555 F.Supp. 1188, and at a subsequent hearing on damages, the Court required the parties to submit affidavits and any other available evidence to establish the extent of defendants' liability to the various plaintiffs for infringing plaintiffs' right of publicity. The resulting submissions have done little to ease the Court's burden of arriving at a measure of damages that will fairly and adequately compensate plaintiffs. All the defendants recorded their sales on a total inventory basis; they did not itemize the sales volume for each individual button title they distributed and therefore cannot accurately state the profits they realized from sales of buttons and other merchandise with the plaintiffs' trademarks, names, logos or likenesses ("marks"). In addition, none of the parties has submitted information that might tend to establish any lawful sales of buttons with authorized marks made possible by the sale of buttons with popular but unauthorized marks.

Plaintiffs suggest that the value of the licenses misappropriated from each plaintiff, with the merchandising rights they confer, provides a reasonable alternative formula to estimate damages in lieu of sales data. Although the value of a license, whether real or hypothetical, may in some instances provide a fair measure of damages, it is an inappropriate measure for computing the liability of defendants in this case. The cost of a license generally represents prepaid royalties on anticipated sales of the licensed merchandise during the license term. The price of the license will vary depending on whether it provides exclusive or nonexclusive merchandising rights and on the range of the merchandising rights it conveys. The economic advantages defendants appropriated by their use of plaintiffs' marks were analogous to nonexclusive licenses for the merchandising of

buttons, square patches and key tags—low cost items compared to T-shirts and posters—and did not include the right to sell the goods involved at concerts.

Plaintiffs have suggested a range of values, with formulas to support their computations, for each license misappropriated. Factual controversy surrounds each of these estimates, however, and precludes their use in assessing damages. Plaintiffs rely on two different sources to value these hypothetical licenses. First they look to the value defendant Button-Up allegedly placed on a nonexclusive one-year button license from Iron Maiden, Judas Priest and Molly Hatchett. They use the offer to Judas Priest as a base license value from which to compute the value of the other hypothetical licenses, dividing the total sales for the subject group by the total sales for Judas Priest, and then multiplying the quotient by the alleged $3,000 offer price. For example, Button-Up's sales data show that it sold 3.5 times more Pat Benatar merchandise than Judas Priest merchandise. Accordingly, the estimate for a Pat Benatar license is $3,000 × 3.5 = $10,-500. Plaintiffs claim that estimates based on this formula represent minimum license values. They posit maximum values based on the offers actually made to, or the licenses actually granted by, the plaintiff performers.

All of plaintiffs' estimates are flawed. As to the minimum license values, defendant Button-Up denies having ever made a dollar offer. It claims, through the sworn affidavits of its president, Douglas Blunden, and of its agent who negotiated the nonexclusive licenses, Ken Czar, that Ira Sokoloff, who manages the commercial affairs of the relevant groups in the United States, placed the monetary value on the licenses. It claims that, although Button-Up had not responded to the offer before Mr. Sokoloff retracted it when he learned that Mr. Czar was affiliated with Button-Up, his adversary in litigation, Button-Up claims they considered the $3,000 offer extravagant and would never have accepted the licenses on those terms. This dispute, through sworn affidavits, as to who originated the $3,000 offer, undercuts the utility of that figure as a basis for assessing damages, although it does indicate what plaintiffs would have accepted from a bidder, though not what one would actually have paid.

Plaintiff's alternative basis for valuing the licenses is also flawed. The actual licenses they have produced, and in some instances their potential licensees, are too vague to serve as a basis for computing damages. For example, plaintiffs offer Bi-Rite's $50,000 license with The Who as the value of the license defendants misappropriated from The Who. Bi-Rite's license with The Who is exclusive, however, and covers a broader range of merchandise than that distributed by defendants. None of the licenses presented by plaintiffs duplicates the goods distributed by defendants. Finally, the sales data offered by Button-Up show that it manufactured buttons for some of the plaintiffs for only a brief six-week period before plaintiffs initiated suit and gained an injunction. Thus, the value of a one-year license would exaggerate the losses that these plaintiffs suffered.

Although defendants have not, and apparently cannot, itemize their sales and distribution of items bearing the individual plaintiffs' marks, defendants Button-Up and Kraftwerk have provided an accounting of their sales sufficiently detailed to provide some assistance in establishing at least a minimum level of damages. In addition, the remedial provisions of the federal Copyright Act, 17 U.S.C. § 504 (1976), lend further assistance in evaluating the extent of defendants' liability in this case; while plaintiffs' evidence may be insufficient to justify granting the full values they seek, that evidence, along with the flagrant weaknesses in defendants' contentions, makes reliance on an analogous, national legislative guideline appropriate.

Defendant Button-Up claims that it filled the bulk of its orders with a random assortment of buttons, and that only a small fraction of its customers specified particular buttons. Button-Up states that it pro-

vided for the popularity of a particular group by manufacturing a proportionately greater number and variety of buttons bearing its mark. By this means it satisfied its customers' desire to purchase more buttons with the marks of popular groups. Button-Up kept records of the number of titles it printed for each group and employed this information, along with its randomized selection process for filling orders, to compute the total sales for the relevant period, and to estimate the proportion of those sales attributable to an individual plaintiff. It then arrived at a profit figure by multiplying the per-group sales by eight percent, the profit margin claimed to have been made on its sales.

Kraftwerk also proposed an estimate of its liability to the individual plaintiffs. Kraftwerk manufactured key tags with the marks of four of the plaintiffs—The Who, Pink Floyd, Pat Benatar, and Styx—and has estimated the profits these sales generated. In addition, it purchased pre-packs of buttons from button manufacturers, including Bi-Rite, which it then sold to retailers; it has assigned a uniform profit value from buttons for each plaintiff. Defendant Button Master has made no effort to itemize its profits.

The Court has broad discretion in arriving at a figure that will adequately compensate plaintiffs, *see Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 657 (2d Cir.1978), and "[i]t is too much to ask a plaintiff who has proved infringement also to do the defendant's cost accounting." *Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir.1983). Defendants' proposed figures clearly underestimate the profits they derived from their infringement of plaintiffs' right of publicity. Button licenses routinely provide for royalties at the greater of 5 cents or 10% of the selling price per button. Button-Up sold buttons for 25 or 42 cents. Thus, a 5 cent per button royalty would range between 11.9% and 20% of the selling price. It is inconceivable that defendants would continue in business if the profits they earned, calculated before salaries were paid to their officers, were less than the

royalties they would have to pay under licenses, and indeed were less than the amount they could earn investing in no-risk bonds; a more reasonable and appropriate profit measure for this case is 20%. In addition, all of the parties agree that, in the button market, the distributor who offers the widest assortment of buttons gains a competitive advantage. Thus, defendants profited not only from the actual sale of buttons bearing plaintiffs' marks but also from the increased sales of unprotected buttons that the sale of buttons bearing plaintiffs' marks made possible. Moreover, defendants' estimates are little more than guesses of profits based on an undocumented pattern of distribution and made from a self-interested position. Given this self-interested imprecision, the added value that use of plaintiffs' marks gave defendants' line of buttons, and the unrealistic level at which defendants have estimated profits, it is appropriate to increase the values provided by Button-Up by an overall factor of five to account for these understatements.

Button-Up's profit estimates on buttons are assigned to all three defendants, since only Button-Up has attempted to break down its button sales in a reasonable manner. However, the defendants did not have equal total sales for buttons. Therefore the multiple applied will reflect not only Button-Up's underestimation of profits but also the relative total sales from which defendants' profits were generated. The resulting values will provide reasonable compensation to plaintiffs and also will serve to deter future violations. A multiple of five is also applied to Kraftwerk's profit estimates for key tags. These estimates, computed on *its* total sales, suffer from the same deficiencies as Button-Up's original estimates. Kraftwerk's gross sales on buttons were considerably less than Button-Up's, however, so a multiple of three will be used to determine this component of its liability. Defendant Button Master has introduced no evidence of its total sales. Plaintiffs, however, have submitted tax returns for the relevant period

**62**

which indicate that Button Master's total sales were similar to Button-Up's. Therefore a multiple of five will also be applied to compute Button Master's liability.

■ The statutory damages provision of the Copyright Act, 17 U.S.C. § 504(c) (1976), provides an appropriate analogy for setting each defendant's minimum liability to the individual plaintiffs, for the reasons stated above, and because the right of publicity resembles the federal copyright law in the monopoly it grants to the commercial use of one's name or likeness. Accordingly, the Act's provision, which allows statutory damages "in a sum between $250 and $10,000 as the court considers just," sets the bounds for an appropriate minimum figure for damages that will effectively deter violation of plaintiff's rights and assure adequate compensation when defendants' profits from misappropriation of a particular plaintiffs' right of publicity, computed from Button-Up's estimates, fall below $250, which is the very least each defendant's violations of each party's rights should be worth.

■ Plaintiff's request for punitive damages is denied. In *Cher v. Forum International, Ltd.*, 692 F.2d 634 (9th Cir.1982), which plaintiffs marshal to support their request, the Ninth Circuit awarded punitive damages only after finding that the defendant knowingly and falsely represented plaintiff as having endorsed its magazine.

The defendants violated plaintiffs' ill-defined publicity rights, and as the opinion on liability explains they had a rational basis for presuming that the plaintiff performers would not seek to enjoin the use of their marks on buttons. Plaintiffs have therefore failed to make the requisite showing of defendants' conscious and intentional disregard of plaintiffs' rights to warrant an award of punitive damages.

Plaintiffs' request that defendants Blunden and Kaplan be held jointly and severally liable is also denied. Plaintiffs have offered no evidence that would permit the Court to reach these defendants' personal assets, assuming they are in fact incorporated. If one or both has acted individually, rather than through a corporation, then of course personal liability follows.

Based upon these considerations and the evidence presented, each defendant's liability breaks down as follows (B = Buttons; K = Keys; M = Minimum):

### SEE ATTACHED SCHEDULE

The Clerk will enter judgment for each plaintiff against each defendant in the amounts indicated in the "Liability of Defendants" columns. Costs will be computed by the Clerk and charged equally to all three defendants.

SO ORDERED.

| PLAINTIFF | BUTTON-UP ESTIMATE | KRAFTWERK KEY TAG ESTIMATE | LIABILITY OF DEFENDANTS | | |
| --- | --- | --- | --- | --- | --- |
| | | | BUTTON–UP | KRAFTWERK | BUTTON MASTER |
| Judas Priest | $42.08 | | M – $250.00 | M – $250. | M – $250. |
| Iron Maiden | 21.04 | | M – 250. | M – 250. | M – 250. |
| Pat Benatar[1] | 301.70 | $787.28 | B – 1508.50 | B – 905.10 <br> K – 3936.40 <br> 4841.50 | B – 1508.50 |
| Neil Young[1] | 108.25 | | B – 541.25 | M – 250. | B – 541.25 |
| Styx | 196.50 | 787.28 | B – 982.50 | B – 589.50 <br> K – 3936.40 <br> 4525.90 | B – 982.50 |

1. Defendants seek to avoid liability for their use of Neil Young's and Pat Benatar's marks arguing that under California law no protection is afforded these marks until after the performers have commercially exploited them. This argument fails, since these performers have exploited their marks through sales of merchandise at concerts and through the marketing and sale of their albums.

|  |  |  |  | LIABILITY OF DEFENDANTS | |
| PLAINTIFF | BUTTON-UP ESTIMATE | KRAFTWERK KEY TAG ESTIMATE | BUTTON–UP | KRAFTWERK | BUTTON MASTER |
| --- | --- | --- | --- | --- | --- |
| Bi-Rite [2] |  |  |  |  |  |
| The Who | $1118.80 | $499.25 | B – 5594.00 | B – 3356.40<br>K – 2496.25<br>5852.65 | B – 5594.00 |
| Pink Floyd | 443.78 | 505.77 | B – 2218.90 | B – 1331.34<br>K – 2528.85<br>3860.19 | B – 2218.90 |
| Devo | 380.66 |  | B – 1903.30 | B – 1141.98 | B – 1903.30 |
| Molly Hatchett [3] |  |  | None | M – 250.00 | M – 250.00 |
| Bi-Rite Totals |  |  | $9,716.20 | $11,104.82 | $9,966.20 |

2. Plaintiff Bi-Rite possessed exclusive licenses from Devo and Molly Hatchett during the period relevant to this litigation. Accordingly, neither Devo nor Molly Hatchett can establish damages for misappropriation of a license; each was compensated fully for the value of its mark by the terms of its license to Bi-Rite. Neither plaintiff has submitted evidence of additional damage done to its mark that would warrant holding defendants liable for amounts greater than the profits gained by use of those marks. Any monies due Devo or Molly Hatchett on defendants' sales would be in the form of royalties on defendants liability to Bi-Rite and should be resolved by those parties.

3. Defendant Button-Up has argued, and supported with undisputed evidence, that it distributed no items bearing the mark of plaintiff Molly Hatchett. None of the other defendants has made or offered support for such a claim. Accordingly, Button-Up suffers no liability to Molly Hatchett while the other defendants are held liable for statutory damages.