**SCHERING CORPORATION, Plaintiff,**

v.

**SCHERING AKTIENGESELLSCHAFT and Berlex Laboratories Inc., Defendants,**

**Schering-Plough Corporation, Additional Defendant on the Counterclaim.**

**Civ. A. No. 82–1392 (CSF).**

United States District Court, D. New Jersey.

Aug. 28, 1987.

Alfred T. Lee, Griffith B. Price, Jr., Milgrim Thomajan Jacobs & Lee, New York City, Ronald Gould, Shanley & Fisher, Morristown, N.J., for plaintiff and defendant on the counterclaim.

John A. Mitchell, Curtis, Morris & Safford, New York City, Gail Allyn, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for defendants.

CLARKSON S. FISHER, Chief Judge.

This case arises from the parties' competing claims to the right to use the name "Schering" in this country. Plaintiff, Schering Corporation, and its subsidiary, Schering-Plough Corporation, defendant on the counterclaim, sue defendants, Schering Aktiengesellschaft West Germany and Berlex Corporation, for infringing on its trade name "Schering," for the use of the name as a false representation of origin and quality of goods, diluting the strength of its trade name and mark in violation of state law, and common law unfair competition. Plaintiffs seek the following: a declaratory judgment stating that defendants' use of the name is a violation of plaintiffs' exclusive rights to the name, an injunction permanently enjoining defendants from using the name without prior authorization from plaintiff, and treble damages for the injury incurred and profits enjoyed by the illegal use of the name. Defendants counterclaim, seeking a declaratory judgment stating that they are permitted to use the name as a business name without a disclaimer, that the Schering name properly is used as a surname, and that plaintiff is misusing its trademark and unfairly competing with defendants. The following are the court's findings of fact and conclusions of law mandated by FED.R.CIV.P. 52(b).

The infringement action is brought pursuant to Section 32(1) of the Lanham Trademark Act of 1946, 15 U.S.C. § 1114(1); the use of false representation of origin is brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and trademark dilution is brought under state law and pursuant to common law unfair competition theories. This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 2201, 2202, and 1338(a) and (b).

*Findings of Fact*

During the course of the trial, the parties expended great quantities of time, effort and paper establishing the existence and histories of the corporations. For purposes of this opinion, I note only the following.

The name to which all parties claim right is that of Ernst Schering, a German pharmacist, born in 1824, who also produced chemicals and offered them for sale from 1864 to 1871 under the name "E. Schering and Company." On October 23, 1871, the company was converted into a joint stock company, "Chemische Fabrik auf Aktien (vorm E. Schering)." Ernst Schering died in 1889, and no descendants with the name Schering are among the current members of defendants' boards of directors, corporate officers or employees. Ernst Schering's son was a member of Schering Aktiengesellschaft West Germany's board of directors until his death in 1947.

On July 23, 1927, Chemische Fabrik auf Aktien merged with C.A.F. Kahlbaum Chemische Fabrik GmbH, to create Schering-Kahlbaum Aktiengesellschaft, or Schering-Kahlbaum AG. Although this company conducted some business in the United States, it did not maintain a place of business here. In 1928, it formed Schering Corporation (Schering AG New York) in New York as a distributor of its products in the United States. Most of the company's distribution in this country was bulk camphor. Schering New York began to manufacture its own finished pharmaceuticals later, in 1933. On April 26, 1932, Schering-Kahlbaum transferred to Schering New York all United States rights to the "Schering" name and mark (Reg. No. 228,145), including the goodwill, trademark registrations (and trademarks covered thereby), and all other business property. This agreement was a complete assignment, containing no restrictions on Schering New York's power to assign or sell any

of the rights transferred.[1] Subsequently, on March 28, 1935, Schering New York obtained a trademark registration (No. 324,677), in its own name, of the Schering name and "flask" design.

The present corporate entity Schering Corporation was organized pursuant to the laws of New Jersey in December 1935 and by assignment acquired all assets of Schering AG New York, which company subsequently was dissolved. The written assignment from Schering New York to Schering Corporation New Jersey was identical in form to the assignment between Schering-Kahlbaum and Schering AG New York; it assigned all rights and assets, including the rights to the Schering name and mark (No. 324,677). Schering Corporation produced pharmaceuticals of its own and continued to distribute Schering-Kahlbaum products, all under the Schering name and mark, and included a reference to Schering-Kahlbaum on those goods imported from Germany.

In 1937 Schering-Kahlbaum merged with Kokswerke und Chemische Fabriken AG to form Schering AG or, as it is called today, Schering AG West Germany. Plaintiff contends that subsequent to this merger Schering AG West Germany made great efforts to dissociate its name from the Schering (USA) corporate name to avoid a public presence in the United States and thereby protect its assets from expropriation during World War II. Plaintiff strongly urges this court to find that defendant Schering AG West Germany engaged in a long-range scheme to preserve its American assets in the face of German-American hostilities of the early 1940s. Plaintiff produced documentation indicating Schering AG's alleged efforts to conceal the ownership of the subsidiary companies by transferring those corporations' ownership shares to Swiss nominees which actually were shells of Schering Germany.

In light of the ensuing Alien Property Custodian (APC) action, this court need not address these contentions. Although these facts are interesting for historical purposes, this court finds that the events which transpired in the months preceding the action by the Alien Property Custodian are irrelevant to the outcome in this matter. In December 1941, with the declaration of war between Germany and the United States, the U.S. situs assets of all German nationals, including the Schering subsidiaries, were seized by the APC; the United States thereby took complete control of Schering Corporation. Pursuant to the Department of Justice, Office of the Alien Property Custodian, Vesting Order No. 4, the Schering AG property seized included the stock of Schering New York and Schering Corporation (New Jersey); a related corporation, Sherka Chemical Company, Inc., New York; undeclared and unpaid dividends of Schering Corporation; Schering AG (Germany)'s United States bank accounts, contract rights and all patent rights and pending patent rights. The vesting order explicitly states that the property included

All right, title and interest, if any, of whatever kind or nature, including without limitation any reversionary interest ... of Schering A.G., ... in and to any goodwill of the business in the United States of Schering Corporation, a corporation organized under the laws of New Jersey, and in and to any and all registered and unregistered trademark or tradenames ... and in and to every license, agreement, privilege, power and right of whatsoever kind or nature arising under or with respect thereto,

is property which is ... within the United States owned or controlled by ... Schering A.G., the aforesaid national of a designated enemy country (Germany); and

---

1. The assignment agreement stated explicitly: ... the assignor has assigned and hereby formally assigns to the assignee, the entire right, title and interest in the United States of America in and to the twenty-three trade mark registrations above enumerated, the trade marks covered thereby and the good will of

the business in the United States of America appertaining thereto.

The same to be held and enjoyed by the assignee, its successors and assigns, as fully and entirely as the same would or could have been held and enjoyed by the assignor if the assignment had not been made.

THERE IS HEREBY VESTED in the Attorney General of the United States the property described above, to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States. Thereafter, the property actually vested in the Alien Property Custodian on April 18, 1942. The order stated that the property and its proceeds were to be held in a special account pending further determination by the Alien Property Custodian. Included in the property expropriated were the ownership shares of Schering Corporation New York[2] and Schering Corporation New Jersey. These shares were expropriated on the basis that they were the property of an enemy alien. The Alien Property Custodian found that the ownership in the name of the Swiss nominee was a sham, intended to defraud the United States and to protect the property from expropriation.

In January 1942, the United States Secretary of the Treasury ousted the German nationals directing and managing Schering Corporation and permanently barred them from entering the premises. At this point, Schering Corporation became a completely independent entity, having absolutely no contact with the Schering AG company. It did not receive any management or direction, raw or processed materials, input or influence of any kind from German Schering. Schering produced, marketed and sold its products on its own.

The United States, through the Alien Property Custodian and his successor, the Office of the Alien Property of the Justice Department, maintained ownership of Schering as the sole shareholder throughout the war and later, until 1952. As sole shareholder, the Alien Property was responsible for appointing management personnel, obtaining loans to cover operational expenses and generally conducting business. The APC appointed Francis C. Brown to manage the corporation until a permanent manager could be found and appointed. Mr. Brown in fact remained in the post through October 1966. During the 1943–1952 period, a five-member board of directors managed Schering Corporation. The board was chosen by the sole shareholder, the Alien Property Custodian.

During this 1943–1952 period, Schering Corporation's research, development and production focused primarily on the areas of steroids, growth hormones, sex hormones, X-ray contrast media and antihistamines. Its sales increased from approximately $2.9 million in 1941 to $16 million in 1950. The physical plants expanded, and new facilities opened in Union and Montclair, New Jersey, personnel more than doubled, and investments in research increased nearly ten-fold. The corporation's new product research enabled Schering to expand into new and previously unexplored areas. Schering was strongly encouraged to assist the United States' economic warfare against the Axis powers, which it did by expanding its sales markets into South America and competing with German companies, including Schering in Germany.

On January 15, 1952, the Office of Alien Property issued another vesting order (No. 18,710) pertaining to Schering Corporation. This order separately vested any and all remaining United States rights Schering AG Germany may have retained to trademarks, trade names, goodwill, etc., of Schering Corporation New Jersey.

On March 13, 1952, the Justice Department sold Schering Corporation's stock at public auction to an individual brokerage syndicate headed by Merrill Lynch Pierce Fenner and Beane for approximately $29 million. The syndicate sold the stock to the general public during 1952–1953 for approximately $31 million.

Since that time, Schering Corporation has grown tremendously. In 1970, Schering Corporation consolidated with Plough, Inc., a Tennessee-based manufacturer of health and personal products. Each company became a wholly-owned subsidiary of Schering-Plough Corporation, and each maintained its separate and independent identity. The parent company was organized as two separate divisions. The Phar-

---

**2.** Vesting Order No. 4 also directed that the Schering New York shares be assigned to Schering New Jersey. Schering New York thereafter was dissolved.

maceutical Operations include Schering-Plough's United States and international pharmaceutical products and its animal health products, encompassing the pre-merger activities of Schering Corporation. The Consumer Operations include the pre-merger activities of Plough and its subsidiaries, namely, cosmetics, proprietary drugs and toiletries, foot care products, international consumer products and Plough Broadcasting. In recent years, Schering-Plough has concentrated on pharmaceuticals and has sold Plough Broadcasting.

I find from the evidence presented that today Schering-Plough manufacturers and markets pharmaceuticals, pharmaceutical intermediaries, animal health care products, vision care products, proprietary drugs, cosmetics, toiletries and foot care products. Its therapeutics include cardiovascular therapeutics, anti-allergenics, diuretics, antibiotics and dermatologicals. Its pharmaceuticals include treatments for asthma, allergies, vitamin deficiencies, mineral deficiencies and respiratory diseases.

Schering also manufactures finished pharmaceuticals for sale to third parties for resale under their own brands and company names with reference to Schering as the manufacturer. I find that the Schering-Plough Corporation enjoys a reputation as a high-quality manufacturer and marketer of pharmaceuticals and personal care products. Today its annual sales have grown to more than $2 billion, and the total value of its outstanding shares of publicly-traded stock is more than $3.5 million.

Today Schering has seven trademark registrations of the *Schering* mark on the United States Patent and Trademark Office principal register. These trademark registrations include coverage for antipyretics, antirheumatics, hormones, antihistamines, X-ray diagnostic agents, sulfonamides, antibiotics, antitubercular agents, antacids, deodorants, antiseptics and disinfectants, veterinary preparations, various pharmaceuticals and diagnostic reagents for laboratory use.[3]

3. Specifically, the registered trademarks, registration numbers, date of issuance and goods covered are as follows:

| Registration Number | Issued | Goods |
|---|---|---|
| 65,291 | September 17, 1907, renewed September 17, 1967 | Anti-pyretics, anti-rheumatics, uric acid solvents, anesthetics, and glycerophosphates |
| 65,626 | October 15, 1907, renewed October 15, 1967 | Antiseptics, deodorants, and disinfectants |
| 325,677 | May 28, 1935, renewed May 28, 1975 | Medicinal preparations recommended for the treatment of disorders of the stomach and digestive organs; medicinal preparations used in hormone therapeutics; genito-urinary antiseptics; laxatives; and X-ray diagnostic agents |
| 588,824 | April 20, 1954, renewed April 20, 1974, Section 8 affidavit filed July 30, 1959, Section 15 affidavit filed July 30, 1959 | Hormones, Antihistamines, X-ray diagnostic agents, sulfonamides, hypnotics, sedatives, anticholinergic agents, anti-tubercular agents, antibiotics, antiseptics, antacids, anti-rheumatics, and motion sickness remedies |
| 925,388 | December 14, 1971, Section 8 affidavit filed Oct. 13, 1977, Section 15 affidavit filed Oct. 12, 1977 | Pharmaceuticals, veterinary preparations, and preparations for diagnosing diseases and disease conditions in human beings |
| 932,814 | April 25, 1972, Section 8 affidavit filed Nov. 7, 1977, Section 15 affidavit filed Nov. 7, 1977 | Pharmaceuticals, veterinary preparations, and preparations for diagnosing diseases and disease conditions in human beings |
| 971,118 | October 23, 1973, Section 8 affidavit filed Jan. 4, 1979, Section 15 affidavit filed Jan. 4, 1979 | Diagnostic reagents for laboratory use |

Schering AG West Germany likewise has developed an international reputation as a high-quality manufacturer of pharmaceuticals and chemicals. It also has grown and flourished on its own, independent of Schering Corporation, despite a difficult period following the cessation of hostilities in 1945. During World War II, Schering AG lost almost all of its physical plants and assets. The mining divisions were expropriated by Russian armed forces. The German Democratic Republic, more commonly known as East Germany, confiscated all of the remaining assets in East Germany and East Berlin. The factories in West Berlin were nearly destroyed by bombing. The only physical plants remaining at the end of the war were two severely damaged chemical and pharmaceutical factories in West Berlin.

Following the Berlin airlift, Schering AG began to rebuild its chemical and pharmaceutical business. In 1953, annual sales had risen to $10 million. The company began to concentrate efforts in the obstetrics and gynecology fields by expanding research and development in the hormone area. It continued production of corticosteroids and X-ray contrast media.

After the war, Schering AG Germany marketed its products in this country through an exclusive sales agent, Henley & Company, New York. The products included bulk hormones, pharmaceuticals, intermediaries and industrial chemicals, which Henley & Co., in turn, sold to third-party manufacturers of dosage-form pharmaceuticals for human and animal preparations. Some of the product labels identified "Schering AG Germany" as the manufacturer. Henley remained the United States distributor of Schering AG products until 1983, when it was purchased by a competitor of Schering AG. At that time two of Schering AG's subsidiaries, Berlex and Sherex Chemical Company, Inc., distributed Schering AG's products. The purchasers of defendants' products include Sterling Organics, Winthrop, Ortho, Parke-Davis, Wyeth and Schering Corporation.

Schering AG West Germany also sold bulk pharmaceuticals in this country pursuant to licensing agreements with United States pharmaceutical companies. These products were pharmaceutical intermediaries, components and ingredients which the pharmaceutical companies would process into dosage-form human and veterinary pharmaceutical products. The original licensing agreement was with E.R. Squibb & Sons, in 1952, which granted Squibb the exclusive license to manufacture all new Schering AG Germany products in the United States. Squibb produced hormones and X-ray contrast media from Schering AG's materials and included a label identifying Schering AG West Germany as licensee.

Schering AG and Squibb subsequently dissolved the exclusive licensing agreement and negotiated nonexclusive agreements. In the late 1950s and early 1960s, Schering AG entered other licensing agreements with other pharmaceutical companies for manufacturing pharmaceutical products from its materials and supplies. Some of these product labels referred to Schering AG West Germany as licensee.

In November and December 1953 Schering Corporation (USA) recorded two Schering trademark registrations and the Schering trade name with the Bureau of Customs pursuant to 15 U.S.C. § 1124. In May 1954 Schering Corporation recorded Trademark Reg. No. 588,824. These registrations were recorded with the Bureau of Customs to prevent importation into the United States of goods bearing the Schering name or mark on goods bearing "copy or simulate" names or marks thereof.

Later that year, in November 1954, Schering AG West Germany applied for recordation of its trade name with the Customs Bureau, which would thereby enable Schering AG to have its goods imported. On January 6, 1955, the Customs Bureau notified AG that it could not import goods bearing the name "Schering AG Berlin" because that name is a copy of the previously-recorded Schering. The Bureau tentatively recorded the name "Schering AG Berlin" with the condition that the legend "not associated with SCHERING CORPO-

RATION USA" accompanied each use of the name.

Schering Corporation opposed the recordation. The Commissioner of the Treasury canceled the tentative recordation, stating that "the Application has not sought recordation of its name for the purpose of prohibiting the importation of goods bearing infringing marks but has sought recordation in order to overcome objections to the importation of its own merchandise marked 'Schering AG Berlin' which marking Customs has held to be a copy or imitation of the Opposer's trademark 'Schering' and of its trade name 'Schering Corporation.'" The Commissioner stated that "the purpose of this recordation is not within the purview of the statute" and canceled the recordation. The Commissioner further stated that goods marked with "Schering AG BERLIN, NOT ASSOCIATED WITH SCHERING CORPORATION USA" (or other words sufficiently distinguishing its goods from Schering Corporation's goods) did not constitute a copy or simulation of Schering's goods.

Defendants urge that, as a matter of fact and law, the issue of likelihood of confusion and use of a disclaimer were fully, necessarily and completely litigated by the Customs proceeding. I disagree. The issue litigated today, namely, defendants' *present* use of the Schering name, was not before the Commissioner. The complete facts regarding actual confusion, as documented in this case by plaintiff, were not presented at that proceeding and, therefore, were not addressed by the Commissioner.

During the post-war period, Schering and Schering AG found themselves competing in various countries. Accordingly, they attempted to resolve their respective interests in the Schering name and mark in competing areas and countries. Schering and Schering AG entered into an agreement in March 1957 providing for the use of the name and mark on a country-by-

country basis, with limitations upon the party which was the senior party in a given country.

The 1957 agreement did not include every country in which the parties competed, because the parties could not agree on how the name and mark were to be used.[4] The parties subsequently negotiated and agreed on the use of the name in all but four countries. These four countries are the companies' domicile countries (the United States and Germany) and their neighbors (Canada and Austria). Defendants contend that in the countries where the parties have been able to identify themselves sufficiently, the public is adequately informed of the separate identities and confusion is avoided. I find that defendants failed to carry their burden of proof on this issue. In fact, plaintiff submits contrary proof, such as inquiries and letters from persons outside this country requesting information about certain finished dosage-form pharmaceuticals. [*See* PX 245, 246, 270, 271, and 274, which contain hundreds of such inquiries and letters.] I find as a matter of fact from these inquiries and letters that pharmacists, doctors, pharmacy professors, medical and pharmacy students, hospital dispensers, nurses, chemists and consumers are among those who actually are confused as to the identity of the respective companies.[5]

Today Schering AG West Germany manufactures and markets pharmaceuticals, pharmaceutical chemicals, industrial chemicals, agricultural chemicals and industrial products. Its operations are divided among five operating divisions: Pharmaceutical, Agricultural Chemicals, Industrial Chemicals, Electroplating and Fine Chemicals. Schering AG has several U.S. subsidiaries which are owned through its wholly-owned subsidiary ASAG, Inc. ASAG functions as a holding company for Schering AG's five other U.S. subsidiaries, including defendant Berlex Laboratories, Inc. Berlex was formed in 1979 by Schering AG to purchase the Internal Medicine Division of

---

**4.** The 1957 agreement, therefore, did not apply to Argentina, Austria, Brazil, Canada, England, Germany, Italy, Spain, Sweden and the United States.

**5.** The issue of confusion is discussed at length at pp. 19–23.

Cooper Laboratories, Inc., and acquire its original product line. The original Cooper products still sold today by Berlex include anti-arrhythmic drugs and antihistamines. Berlex is organized into three divisions: (1) Pharmaceutical, which markets pharmaceutical products (including oral contraceptives); (2) Imaging, which produces contrast media products; and (3) Berlichem, which sells and markets pharmaceutical fine chemicals.

The products Berlex manufactures and sells today include pharmaceutical and health care products, such as hormone products, inflammation inhibitors (corticoids), X-ray contrast media, chemo-therapeutics (sulfonamides), oral contraceptives and dermatologicals. This court notes that some of these products are directly competitive with Schering Corporation's products and, therefore, are promoted in the same markets.

Berlex used the "Schering" name in promotional materials and during sales presentations by designating "Schering AG West Germany" as its parent company. It was the use of the Schering name that gave rise to this litigation.

The other Schering AG subsidiaries in the United States are Nepera, Sherex, Chemcut and Nor-Am. Nepera, a New York corporation, manufactures and sells industrial chemicals such as pyridine, picolines and derivative products, and intermediate fine chemicals such as Vitamin B, phenyl propanol amine and hydrochloric acid for use in production of pharmaceuticals, agricultural chemicals, pesticides and industrial chemicals. Nepera identifies itself as a subsidiary of Schering AG West Germany, without the accompanying legend "not associated with Schering Corporation USA." Nepera's letterhead, business cards, price lists and other published material similarly do not contain the disclaimer legend after the Schering AG West Germany name.[6]

I find as a matter of fact that Schering Corporation and the subsidiaries companies are competitors in the areas of pharmaceuticals, pharmaceutical intermediates and chemicals. Defendants' assertions that they did not attempt to benefit by mistaken affiliation and identification with Schering Corporation (USA) are not credible. The testimony of Dieter Fischer and R.E. Liptrot, employees of Schering AG and Berlex, respectively, naturally is biased in favor of the employers. In light of the evidence presented regarding the strength of the Schering name, their testimony is not credible.

ASAG, Inc., purchased Ashland Chemical Company's assets in 1978 to form Sherex Chemical Company, Inc., as part of Schering AG's Industrial Chemicals Division. Sherex sells Schering AG's industrial chemicals to industrial chemical companies, manufacturers of household products, personal care products and road asphalt, iron ore refiners, textile manufacturers and producers of swimming pool chemicals. At the time of trial, Sherex' annual sales in the United States were approximately $145 million.

In 1980, Schering AG acquired Chemcut Corporation, a formerly-independent United States corporation. Chemcut, as part of Schering AG's Electroplating Division, primarily manufactures, distributes and sells chemicals and apparatus used in the manufacture of wiring boards and accessories, and distributes and sells electroplating machines and electroplating chemicals.

In 1969, Schering AG and Morton-Norwich Products, Inc., of Chicago, founded Nor-Am Agricultural Products, Inc., as a joint venture. Nor-Am, a Delaware corporation, is a wholly-owned subsidiary of Schering AG through ASAG, Inc., and operates within Schering AG's Agrochemicals Division. It markets and sells Schering AG's pesticides, herbicides and other agricultural chemicals.

The subsidiary companies, Sherex, Chemcut, and Nor-Am, refer to Schering AG in letterheads, calling cards, product brochures, product data sheets, advertising

**6.** After trial was completed, Schering AG sold the Nepera subsidiary to an independent third party.

and promotional materials much in the same manner as Nepera did. Namely, references to Schering AG are made without the disclaimer legend and without geographic designation. Schering AG refers to Sherex as "Schering Industrial Chemicals USA." Witnesses for defendants admitted at trial that reference to "a large international corporation with strong financial backing" is beneficial to sales presentations, and accordingly refers to Schering AG and wishes to continue to do so. Defendants' assertion that they intend to benefit only from the association with the international reputation with Schering AG is not credible in light of the evidence presented; it is clear that the subsidiary companies intend to gain from mistaken association with Schering Corporation's reputation.

Plaintiff presented extensive evidence of confusion, which confusion plaintiff alleges occurred as a result of the similarity of the parties' names. This evidence is credible, reliable, well-presented and indicative of a high degree of actual confusion engendered among many individuals in all possible areas of exposure to the Schering name. I am impressed by the tremendous amount of confusion engendered by the similarity of the corporate names; this evidence is remarkable by its sheer volume alone. For instance, the confusion includes instances involving the general public, medical and health care professionals, pharmaceutical buyers, attorneys, government officials, members of the press, consumers, and even among Schering AG employees. Furthermore, the evidence presented indicates that this confusion is not alleviated by the use of a disclaimer legend or geographical designation.

Among the most persuasive of plaintiff's exhibits were PX 270–274. These exhibits include records of telephone inquiries and written inquiries made to Schering Corporation about products which it does not manufacture, market or distribute, but which instead are Schering AG West Germany products. These inquiries originate from virtually all possible persons who have come into contact with Schering AG West Germany products.

I find that actual mistaken identity and confused identity is particularly well demonstrated by the various lawsuits erroneously initiated against Schering Corporation because of mistaken association with Schering AG West Germany. During this trial, plaintiff presented evidence of eight class action products liability actions naming Schering Corporation as a defendant with other drug manufacturers. All actions subsequently were dismissed as against Schering Corporation, and Schering AG thereafter was named as a defendant in at least one of the actions. Accompanying media coverage discussed "New Jersey manufacturers" of the drugs and "Schering AG West Germany" without the use of the disclaimer legend. "Confusion now hath made his masterpiece!" *Macbeth*, II, iii, 72.

Defendants' contention that the sophistication of its customers immunizes defendants' use of the Schering name in the United States is not persuasive. As is shown in PX 270–274, physicians, radiologists, other health care professionals, buyers of the subsidiary companies' products, and even suppliers and employees, persons who should have greater familiarity with the corporate structure and associations, indeed have been confused as to the identity of the companies. Furthermore, I find that physicians may not fall within the category of "sophisticated customers" because, as testimony indicated, doctors may not make a thorough review of pharmaceutical pamphlets given to them by sales representatives.

I find as a matter of fact that the confusion engendered by the similarity of the parties' names is partially caused by three interrelating factors endemic to the pharmaceutical industry. First, confusion occurs in this case because of abbreviation. The parties, their lawyers, the witnesses and the court naturally tend to abbreviate the parties' names simply to "Schering" from "Schering Corporation," "Schering-Plough," "Schering AG," and "Schering AG West Germany." Evidence presented indicates that defendants abbreviate the Schering AG name to simply "Schering"

intra-office, yet attempt to carefully add the "AG" when referring to itself outside the corporation. As diligent as defendants may be in referring to itself as "Schering AG" to outsiders, I find as a matter of fact that confusion exists between the names "Schering" and "Schering AG." In effect, these two names are the same.[7]

I find as a matter of fact that the tendency to abbreviate is not limited to Schering. Other pharmaceutical companies similarly abbreviate their true corporate names. For example, Hoffman-LaRoche refers to itself as "Roche" in its annual report, and Ciba-Geigy refers to itself as "Ciba." In these corporations, the abbreviated name indicates the same company as the full name, unlike the Schering abbreviation.

The second pharmaceutical industry phenomena which causes confusion is the international nature of pharmaceutical companies. The parties presented evidence of divisions of other pharmaceutical corporations which have similar, but not identical, suffixes, depending on the native language of the situs country. For example, the suffix "Inc." or "Co." may be used in this country where "Ltd.", "AG", "KG", or "GmbH" may be used in other countries. With these other companies, the suffix is irrelevant; the denominative corporation is the same. Such is not the case with the Schering and Schering AG names.

Finally, I note that other pharmaceutical companies have branched into the related divisions of chemicals, industrial chemicals and agro-chemicals, not unlike Schering and Schering AG. For instance, American Home Products (AHP) produces pharmaceuticals under Wyeth, Ayerst and Ives Labs, and produces household and industrial cleansers under other names. Sandoz Corporation and Ciba-Geigy Corporation likewise produce pharmaceutical, industrial and consumer products and chemicals, dyes, plant protection and pest controls. In each of these situations, the different divisions are part of the one parent division. Again, such is not the case with the Schering and Schering AG divisions. I find as a matter of fact that persons dealing

with the Schering AG divisions are confused as to the identity of the manufacturer and the lack of association with Schering.

*Conclusions of Law*

█ This court holds at the outset that the August 10, 1983 entry of partial summary judgment in favor of defendants does not constitute *res judicata* on the issues addressed, does not constitute "the law of the case" on those issues, and does not bar this court from modifying or vacating that order. FED.R.CIV.P. 54(b) explicitly states that

> [a]ny order ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than the parties shall not terminate the action as to any of the claims or parties, and the order of other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In the Third Circuit, this rule applies to orders granting partial summary judgment. *United Bonding Insurance Co. v. Stein,* 410 F.2d 483 (3d Cir.1969) holds that in the absence of Rule 54(b) certification of final judgment, the partial summary judgment is subject to revision at any time before the entry of final judgment on all the claims presented in the action. *Id.* at 486. This court's opinion and order of August 10, 1983 is vacated to the extent that it found defendants' use of the legend "Schering AG, West Germany, not associated with Schering Corp., U.S.A." to be a permissible non-infringing "fair use" of the Schering name.

Plaintiff's first claim for relief is for a declaration of plaintiff's statutory exclusive right to use the Schering name and mark in commerce in this country for the goods for which its registrations have become incontestable.

█ A trademark is "any word, name, symbol, or device or combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or

---

**7.** This point is further addressed in the conclu-     sions of law at p. 25.

sold by others." 15 U.S.C. § 1127. A tradename is a name "used by manufacturers, industrialists, merchants, agriculturists, and others to identify their business, vocations, or occupations." 15 U.S.C. § 1127. A tradename identifies the business of the producer of goods while a trademark identifies the goods themselves. *Vera Perfumeria y Cosmetica, S.A. v. Vera Licensing, Inc.*, 214 U.S.P.Q. 495, 496 (S.D.N.Y.1980). This court finds that plaintiff owns seven valid trademark registrations for "Schering" issued by the United States Patent Office. These registrations are "incontestable" pursuant to 15 U.S.C. § 1065. *See Park–N–Fly, Inc. v. Dollar Park And Fly, Inc.*, 469 U.S. 189, 191–192, 105 S.Ct. 658, 660–661, 83 L.Ed.2d 582 (1985). This incontestable status provides, subject to the provisions of § 15 and § 33(b) of the Lanham Act, conclusive evidence of the registrant's exclusive right to use the registered mark. 15 U.S.C. § 1115(b). Accordingly, plaintiff has the exclusive right to use the Schering name and mark for the goods and products of the kind described in the trademark registrations (subject only to the possible defenses listed in § 1115(b), discussed *infra*).

Plaintiff's claims of trademark infringement and unfair competition are based on the Lanham Act, 15 U.S.C. §§ 1114 and 1125. Title 15 U.S.C. 1114(1) states in pertinent part that

[a]ny person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided....

Accordingly, this statute raises two issues for determination, namely: (1) whether defendants' use of the name is a copy or colorable imitation of a registered mark, and (2) whether such use is likely to cause confusion. "Where the trademark owner and the alleged infringer deal in competing goods and services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983).

■ As a matter of fact and law, I find that the defendants' use of the Schering name is a colorable imitation of plaintiff's registered marks. The names Schering and Schering AG in effect are the same; the addition of the geographic designation has no effect. *See Koppers Company, Inc. v. Krupp-Koppers GmbH*, 517 F.Supp. 836 (W.D.Pa.1981), *aff'd*, 676 F.2d 686 (3d Cir.1982); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons*, 365 F.Supp. 707 (S.D.N.Y.1973), *modified*, 523 F.2d 1331 (2d Cir.1975). All parties presented evidence indicating defendants' actual use of the Schering name. On pharmaceutical products, the Schering AG name generally was accompanied by the disclaimer legend; on non-pharmaceutical products, the Schering AG did not include the disclaimer. Accordingly, I find that defendants' name is a copy or colorable imitation.

The second part of the test for trademark infringement under the Lanham Act is likelihood of confusion. Likelihood of confusion exists whenever buyers who encounter the mark are likely to assume that the product or service is associated with the source of a different product or service. *American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16, 20 (E.D.Pa.1981); *affirmed*, 681 F.2d 804 (3d Cir.1982). In *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225 (3d Cir.1978), the Third Circuit enumerated the following ten factors relevant to the determination of likelihood of confusion: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length

of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market. *Id.* at 1229.

This aspect of the infringement issue pertains to the goods covered by the trademark registrations. As for goods which are not directly competitive, such as the agrochemicals, electroplating elements and industrial chemicals, protection can be had only if "Schering" is shown to have "secondary meaning." *Scott Paper*, 589 F.2d at 1228.

> Secondary meaning exists when consumers seeing a trademark assume that the product it labels come from a particular source. If in fact the product did not come from a particular source, then there has been product confusion.... Likelihood of confusion and secondary meaning are in theory different concepts. In practice, however, the evidence required to show either, and the legal consequences flowing from a finding of either, will be virtually indistinguishable.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d at 462.

Accordingly, this court must address the same ten factors to determine whether plaintiff's name and mark have been infringed upon for both competing and non-competing goods.

■ Plaintiff's claims for unfair competition are brought pursuant to § 43 of the Lanham Act, 15 U.S.C. § 1125. This statute states in pertinent part

> *False designation of origin and false description forbidden.*
>
> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or symbols tending to falsely describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable in a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

As with the infringement claims, the key to establishing a claim of false designation of origin lies in proving that defendant's use of a trademark or packaging creates a likelihood of confusion. *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 560 (1st Cir.1982). As a general rule, the same facts which support a claim for trademark infringement or common law unfair competition will support an action for false designation of origin of goods. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d 1004, 1010 (5th Cir.); *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *see also, Estate of Presley v. Russen*, 513 F.Supp. 1339, 1376 (D.N.J.1981).

The issue of likelihood of confusion is, for all practical purposes, irrelevant in this case because I find that actual confusion exists as to the lack of association between Schering and Schering AG. However, for purposes of this opinion, I will address the factors. First, the degree of similarity between the marks has been addressed; I find the names are identical for all practical purposes. Second, the strength of the owner's mark is obvious according to the number of incorrect calls and inquiries made to Schering and Schering-Plough based on name recognition alone. Third, the issue of the care and attention expected of consumers when making a purchase was extensively discussed at trial. Defendants presented an extensive amount of credible evidence tending to prove, for example, that physicians do not have time or inclination to adequately review pharmaceutical product brochures. Furthermore, the ultimate consumers of pharmaceutical products similarly do not review accompanying

product brochures. This and other evidence indicates to me that the care and attention expected of consumers and buyers will not tend to alleviate confusion. The overwhelming evidence of actual confusion renders the fourth and sixth factors favorable to plaintiff. The fifth factor, the intent of the defendant in adopting the mark, is highly disputed. Defendants assert that they wish to benefit only from association with the German parent, Schering AG West Germany. Plaintiff argues that defendants are using the mistaken association with Schering Corporation as a "door opener." I find plaintiff's view more plausible, and this factor operates in favor of plaintiff. The seventh and eighth factors, the marketing of goods, has been addressed previously; this court determines that pharmaceuticals and chemicals of the companies have been marketed in similar channels and to similar targets. The ninth factor involves the similarity of function of the goods in the minds of the public. As I discussed in the section pertaining to the natural diversification of pharmaceutical companies into chemical companies, I find that the similarity of function factor operates highly in favor of plaintiff's position, and is a great source of confusion. Finally, the tenth factor, which is a catch-all for anything else which might cause confusion in a particular case, operates in favor of plaintiff. This includes the previously-discussed tendencies to abbreviate the parties' names and other phenomena endemic to the pharmaceutical industry. Accordingly, the similarity between the parties' names is likely to, and does, cause a tremendous amount of confusion.

■ Plaintiff alleges that, pursuant to 28 U.S.C. § 1338(b), this court can take jurisdiction over its dilution claim, which is based in the various state anti-dilution laws (*see, e.g.,* Plaintiff's Proposed Conclusions of Law, n. at 17). In essence, plaintiff claims that defendants' use of the Schering name as part of its name and mark will dilute the distinctive significance of plaintiff's "Schering" name and mark, in violation of state anti-dilution laws. Dilution occurs where use of a trademark by a subsequent user will lessen the uniqueness of a prior user's mark, with the possible result that a strong mark will become a weak mark. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 265 (5th Cir. 1980); *rehearing denied,* 617 F.2d 295 (1980); *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). See also *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 450 (5th Cir.1973). In essence, dilution is the "whittling away" of an established trademark's distinctiveness and hence its selling power through its unauthorized placement on dissimilar products. *Bi-Rite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188, 1196 (S.D.N.Y. 1983); *Supplemented by* 578 F.Supp. 59 (S.D.N.Y.1983). "When consumers are confronted with dissimilar use of a strong trademark they tend no longer to associate the mark with the quality reputation that a producer may have established in a market." *Id.*

■ In this case, I find that Schering AG's use of the Schering name by the various subsidiaries which are not directly competitive with Schering Corporation (the Nor-Am, Sherex and Chemcut product lines) tends to dilute the strength of the Schering name. "Schering" is distinctive; that name is not used in other businesses and is not a common surname. Accordingly, defendants' use of the name in product lines which are not directly competitive should be enjoined.

Plaintiff and defendants presented evidence of surveys conducted which purported to indicate the confusion or lack of confusion engendered by the similarity of the parties' names. This court is well aware that properly conducted surveys are admissible in infringement and unfair competition cases. [Title 15 U.S.C. § 1125(a), FED. R.CIV.P. 52(a), 65(a)(2); *American Home Products v. Barr Laboratories, Inc.,* 656 F.Supp. 1058, 1062 (D.N.J.1987).] I accord the surveys very little weight; I am not convinced that the surveys were either properly conducted or indicate what the parties allege.

■ The characteristics of a properly conducted survey are that the proper uni-

verse was examined and a representative sample was chosen, the persons conducting the survey were experts, and the data was properly gathered and accurately reported. Furthermore, the sample design, questionnaires and manner of interviewing must meet the standards of objective surveying and statistical techniques. The survey must be conducted independently of the attorneys involved in the litigation. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978).

Plaintiff's survey attempted to test the effectiveness of the disclaimer legend, "not associated with Schering Corporation U.S. A." The problem with this survey is that when interviewees responded simply "Schering" to identify the manufacturer, plaintiff assumes that "Schering" meant "Schering Corporation." In fact, I have no way of knowing exactly what the respondents meant. Accordingly, all "Schering" answers must be discounted. The court notes, however, a small percentage who actually responded "Schering Corporation" or the like, thereby evidencing the ineffectiveness of the disclaimer.

Defendants' survey was not helpful because the survey was not designed to test whether respondents were affected by the disclaimer legend. The questions instead were geared to whether the interviewees understood that Berlex is distinct from Schering AG, rather than whether they understood that Schering AG is distinct from Schering. Accordingly, I find the survey to be of little use on the issue of the effectiveness of a disclaimer.

Both surveys are, however, very persuasive evidence of the tendency to abbreviate the Schering names and persuasive evidence of confusion.

As affirmative defenses and as part of their counterclaim, defendants seek to have this court declare that plaintiff is collaterally estopped from asserting likelihood of confusion, that plaintiff is barred by laches, and estoppel from interfering with defendants' use of the Schering AG name, that defendants have a statutory right to use the Schering name under the "fair use" doctrine, and that plaintiff is misusing its trademark and unfairly competing with defendants.

■ First, the court notes that *Park–N–Fly, supra,* clearly holds that only the Lanham Act statutory defenses may be asserted against a mark covered by an incontestable registration. Accordingly, this court need only address the abandonment, fair use and surname defenses. For purposes of the record, however, I will address all defenses raised. Second, the court notes that the evidence presented does not support the defenses raised.

Schering AG bases its "fair use" argument on the premise that it has a right to use its own name to identify itself as the producer of its goods and as the parent of its subsidiaries. Defendants cite examples of where other courts have used the "fair use" doctrine to permit others than the trademark holder to use the trademark in a good faith, non-exploitive manner to truthfully convey information to the public. Defendants' claim of "fair use" fails for the simple reason that their intended use of the Schering name is confusing, and a confusing use of the name is not a fair use of the name.

Fair use is a valid defense "when the term is not being used as a trademark by the party charged with infringement and is used in good faith to describe the product to its consumers." *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 908 (7th Cir.1986). "[I]t would be somewhat anomalous to hold that the confusing use of another's trademark is 'fair use'." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206, n. 9 (2d Cir.1979).

■ None of the cases cited by defendants persuade me otherwise than that fair use is applicable here. The geographical designation tacked on to the infringing name does not avoid infringement of the entire name [*See Carl Zeiss Stiftung v. Veb Carl Zeiss Jena,* 433 F.2d 686 (2d Cir.1970); *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).] and cannot form the basis of an "informational Purpose claim."

Defendants also contend that their use of "Schering" is valid as a surname. A term originally a surname can become a protectible mark by acquiring a secondary meaning through extensive use. *Interpace Corp. v. Lapp, supra.* As discussed previously, the Schering name has acquired secondary meaning; consequently, defendants contention of valid surname designation is without merit.

Defendants assert that plaintiff is barred by laches and acquiescence from interfering with their use of the "Schering AG West Germany" name. I disagree. Defendants have not shown any written or oral agreement permitting them to use the Schering name in this country, or any other indicia of acquiescence. On the contrary, the parties presented evidence of an agreement for the use of the Schering name in other countries, with certain companies explicitly omitted from the agreement, namely, the United States and Germany. The laches and acquiescence defense generally is "reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence." *Estate of Presley,* 513 F.Supp. at 1351; *Jenn-Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48 (3d Cir.1972). Plaintiff candidly admits that it had some knowledge of Schering AG being identified as a licensor of products sold under U.S. producers. I do not find that this knowledge rises to the level of actionable acquiescence; this defense fails.

Regarding plaintiff's claim for damages, the court notes that plaintiff makes no attempt to calculate or prove monetary loss or any other monetary basis for damages, but instead relies on its claim for unconditional injunctive relief. This claim is based on the incalculable "irreparable injury" which ordinarily follows when likelihood of confusion or risk to reputation appears. *See Tefal, S.A. v. Products International Co.,* 186 U.S.P.Q. 545 (D.N.J. 1975) *affirmed,* 529 F.2d 495 (3d Cir.1976). This type of injury arises from (1) the inherent difficulty of proving damages caused by confusion and (2) the impairment of intangible values such as the strength of the mark, reputation and good will. *Franklin Mint, Inc. v. Franklin Mint, Ltd.,* 331 F.Supp. 827 (E.D.Pa.1971).

Injunctive relief is appropriate in this case. Because of the confusion engendered by defendants' use of the Schering name, the risk to Schering Corporation's reputation, and the dilution of the strength of plaintiff's name and mark which results from defendants' use of the name, defendants are enjoined from using the Schering name for any purpose, *i.e.,* advertising, promotional, informational or geographical, in this country.

Plaintiff also seeks attorneys' fees and costs expended in initiating and prosecuting this action pursuant to 15 U.S.C. § 1117, which provides that "the court in exceptional cases may award reasonable attorneys' fees to the prevailing party." Plaintiff alleges that this case must be deemed "exceptional" within the meaning of the statute. I disagree; plaintiff has not carried its burden of proving that defendants' use of the name under which it does business in other countries renders the circumstances of this case "exceptional" within the meaning of 15 U.S.C. § 1117. Furthermore, plaintiff has not shown that defendants' actions can be characterized as fraudulent, deliberate, willful or malicious. *See, e.g., Salton, Inc. v. Cornwall Corp.,* 477 F.Supp. 975 (D.N.J.1979). Plaintiff's claim for fees, therefore, is denied.

## Conclusion

Therefore defendants' use of the name Schering is a violation of plaintiff's exclusive rights to the name and defendants are permanently enjoined from using the name Schering on its products or in its advertising without license or authorization from plaintiff. The counterclaims are dismissed.