**COHERENT, INC., Plaintiff,**

v.

**COHERENT TECHNOLOGIES, INC., Defendant.**

**Civ. A. No. 89–A–952.**

United States District Court, D. Colorado.

May 2, 1990.

---

Bruce G. Klaas, Klaas & Law, Denver, Colo., Veronica Colby Devitt, Carol L. Smith, Limbach, Limbach & Sutton, San Francisco, Cal., for plaintiff.

Charles H. Jacobs, David A. Weinstein, Bourke Jacobs Luber, P.C., Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

ARRAJ, District Judge

Coherent, Inc. has alleged federal claims against Coherent Technologies, Inc. for trademark infringement and false designation of origin under 15 U.S.C. §§ 1114 and 1125(a) (1988), respectively, and a state law claim for unfair competition. Plaintiff seeks injunctive relief and attorney fees.[1] Exercising original jurisdiction over the federal claims pursuant to 15 U.S.C. § 1121 (1988), 28 U.S.C. § 1338(a) (1988), and over the state law claim pursuant to 28 U.S.C. § 1338(b) (1988), this court held a bench trial on March 26–27, 1990.[2] The following memorandum opinion constitutes my findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

### FINDINGS

The parties stipulated to the following facts, which the court adopts:

1. Plaintiff is a California corporation, incorporated on May 21, 1966 under the name CRL, Incorporated. On July 21, 1966, plaintiff changed its name to Coherent Radiation Laboratories and on November 15, 1969 changed its name to Coherent Radiation. On May 7, 1977 the

---

1. Plaintiff originally requested an accounting of profits, compensatory and punitive damages, and attorney fees. It has waived expressly its claim for damages. Since Plaintiff presented no evidence as to an accounting, the court deems this claim waived also.

2. The parties filed cross-motions for summary judgment so late that the court was unable to hear arguments prior to trial. Nonetheless, in relation to final disposition of this case, the court has considered these motions and accompanying briefs, the evidence adduced at trial, and counsel's arguments and post-trial briefs.

name was further shortened to its present name, Coherent, Inc.

2. Plaintiff's headquarters are in Palo Alto, California and it has a subsidiary, Coherent General, located in Sturbridge, Massachusetts.

3. Since its incorporation Plaintiff has been in the business of developing, manufacturing and selling lasers and laser systems. It also offers services related to the use of its products.

4. Plaintiff has used its "COHERENT" trademark on goods in interstate commerce since April 3, 1973.

5. On July 18, 1974 plaintiff applied for its first federal registration of the "COHERENT" mark in Application Serial No. 27,081, for: laser beam apparatus, automatic objective refractors, optical lenses, optical power meters, meters measuring wavelength frequency and intensity of light; surveyors' reference and alignment source using a laser, laser photo coagulators, and laser technology services.

6. The Trademark Examiner initially refused to register the mark on the grounds that the word "coherent" was merely descriptive and generic in the field of radiation.

7. Plaintiff subsequently amended its application to seek registration of "COHERENT" under Section 2(f) of the Lanham Act supporting the registrability of its mark with substantial evidence of acquired secondary meaning.

8. The Trademark Examiner made final his refusal to register the mark and plaintiff appealed to the Trademark Trial and Appeal Board on December 16, 1976.

9. On June 13, 1978, plaintiff's "COHERENT" trademark was granted Federal Registration No. 1,093,109.

10. Plaintiff has subsequently obtained Reg. Nos. 1,283,046; 1,267,351; 1,267,401; 1,267,427; and 1,093,109, for the "COHERENT" mark. Five of the six registrations have now become incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

11. Plaintiff is a designer, manufacturer and supplier of electro-optical laser systems, industrial laser systems, and medical instruments utilizing laser precision optic and microelectronic technologies.

12. Plaintiff's products include optically pumped ion lasers, dye lasers, Nd:Yag lasers, helium-neon gas lasers, carbon dioxide lasers, laser systems and component parts.

13. Plaintiff's net sales in 1989 were $201,649,000.

14. Plaintiff's advertising and promotional expenditures in 1989 were $1,987,000.

15. Defendant, Coherent Technologies, Inc., a Colorado corporation, incorporated on June 11, 1984, is located in Boulder, Colorado.

16. Coherent Technologies, Inc. develops and markets coherent laser radar (lidar) systems with applications at atmospheric remote sensing and in target tracking, ranging and imaging. Coherent Technologies, Inc. focuses its capabilities in three major areas: Theoretical performance and design; Development of $CO_2$ and solid state coherent lidar systems for government agencies such [sic] DOD and NASA; and Commercial product development of lidar systems.

17. Defendant has designed and fabricated a coherent lidar system in connection with and as part of its research and development for the needs of a particular project as a necessary piece of equipment to accomplish the projects' objectives.

18. Defendant secures contracts for its services by making proposals to governmental and non-governmental entities, such as NASA and the U.S. Air Force.

19. Defendant does not affix its corporate name to any product.

20. Plaintiff first became aware of defendant at a trade conference held in late April, 1988 where employees of defendant presented a paper.

21. After learning of defendant, plaintiff investigated defendant's business and sent a cease and desist letter to its President on September 9, 1988.

22. Settlement discussions ensued during late 1988 and early 1989.

23. When it was determined that settlement was no longer attainable plaintiff filed this suit on May 31, 1989.

Stipulated Facts ¶¶ 1–23.

In addition to the facts to which the parties stipulated, I further find as follows:

Several scientific terms were used frequently in this trial. First, the term "coherent" was defined by the U.S. Trademark Trial and Appeal Board (TTAB) when it granted Plaintiff's first trademark registration, and I adopt it here:

> "coherent" means that the light waves or photons are not scattered or random but are in phase in frequency and spatial relationship. It is the coherency of the radiation which results in the highly concentrated energy that makes lasers useful in a great variety of applications.

Exh. I at 101124–25.[3] "Coherent" is commonly used descriptively in the scientific community. Second, the term laser is an acronym for "light amplification by stimulated emission of radiation." *McGraw–Hill Encyclopedia of Science & Technology* 579 (6th ed.). All lasers emit coherent light to some degree. Finally, the term "lidar" means "coherent laser radar," which is used in remote atmospheric sensing and in target tracking, ranging and imaging. *See* T.252–253 (Huffaker Testimony); Stipulated Facts ¶ 16.

Plaintiff sells a wide variety of lasers for scientific, medical and industrial applications. It also sells laser-based systems, laser apparatus, custom laser systems, components for lasers and laser systems, and sub-components of components that are used in lasers or laser systems. Collectively, the company's four divisions (medical, industrial, scientific and original equipment manufacturing (its components division)) are located in the United States, England and West Germany.

Since its founding in 1966, Plaintiff has had sales of approximately $1.4 billion and has spent approximately $200–250 million in promoting the products sold under the "Coherent" name and mark. In addition to Plaintiff and its largest competitor, the world-wide laser market includes five to ten companies of significant size and a few thousand smaller companies. By dollar volume of lasers sold, Plaintiff's sales constitute about a twenty percent share of that market. In terms of world-wide market share, Plaintiff is second only to Spectra–Physics, which has about twenty-five percent.

Plaintiff sells its products directly to some customers, the single largest of which is the Japanese firm Shiboia. It also has indirect customers, such as the Department of Defense, which fund direct customers. Its single largest indirect customer is the U.S. Government ("Government"). If sales to all of its agencies are totalled, however, the Government is also its single largest direct customer. In addition, Plaintiff develops lasers for particular applications for entities under contract with the Government. It produces components that can be used in Defendant's coherent lidar systems. Plaintiff's non-laser products range in price from "several hundred dollars" for components to $1.5 million for some systems that incorporate lasers. Its laser products range in price from $10,000–$100,000; the average sales price of these laser products is $50,000–75,000.

---

**3.** This definition is supported by other evidence presented at trial. Dr. Howard Powell, Plaintiff's expert in the laser field, testified that coherence was a general property of waves which describes the correlation of a wave's oscillation in one point in time and space with the oscillation at another point in space and time. Dr. Michael Hardesty, Defendant's expert, testified that the term "coherent" "describes the relevant properties of two electro-magnetic fields, or currents.... It implies that the fields or currents have some relationship with each other. It's predictable. They change in a manner that—if one changes, the other changes in a similar manner." Transcript (T.) at 103 (Hardesty Testimony). *See also Random House Dictionary of the English Language* 400 (2d ed. 1987) ("coherent" defined as "of or pertaining to waves that maintain a fixed phase relationship, as in coherent light"); *McGraw–Hill Encyclopedia of Science & Technology, supra,* at 130 (coherence is "[t]he attribute of two or more waves, or parts of a wave, whose relative phase is nearly constant during the resolving time of the observer"); *Dictionary of Electronics* 52 (2d ed. 1987) (coherence is "[t]he maintenance of a fixed frequency").

Plaintiff generally advertises its products in mass-produced sales brochures, catalogs and data sheets. Potential customers may return the response cards that are attached to some of the brochures and catalogs to Plaintiff, which has sales representatives who call on them. Plaintiff also advertises in professional journals, through direct mail, in trade shows and through participation in major conferences. Within the entities to which it sells its products, Plaintiff deals directly with wide variety of people, including purchasing agents, engineers, senior buyers, chief project engineers, project managers, corporate officers, professors, physicists, research scientists, senior chemists, graduate assistants, laboratory assistants, and lab technicians.

Defendant has never sold lasers or scientific equipment, nor does it plan to do so. Moreover, as of the date of trial, it had completed only one project. It uses lasers as components in its coherent lidar systems, e.g., as one of the energy sources in its systems or as alignment lasers. The average price of one of Defendant's coherent lidar systems is more than $500,000.

Defendant obtains business in two ways, through solicitations from those who know its capabilities and through submissions of proposals upon learning of opportunities in the "Commerce Business Daily" provided by the Government. Defendant does not have any sales representatives. Milton Huffaker, Defendant's President, testified that to obtain business for his company, he contacts a senior scientist or project manager, not a purchasing agent who purchases equipment. Defendant does not sell its services through intermediaries.

Defendant produces some advertising materials, including a capabilities brochure, which has been distributed to about twenty to thirty people, letterhead, business cards and purchase orders. Each of these refers to "Coherent Technologies, Inc." and notes the company's address and phone number. Furthermore, in its entry in the "Laser Focus Buyers' Guide 1990," Defendant's full company name, address and phone number appear with a brief description of

the services it provides.[4] Five of Plaintiff's divisions are described in entries placed on either side of Defendant's entry (two above and three below); in four of these—including those on either side of Defendant's entry—Plaintiff has displayed prominently the mark "Coherent" with a "bug" mark inside a black boundary.

When Milton Huffaker, Defendant's President, selected the company name "Coherent Technologies, Inc.," he knew of Plaintiff as a laser manufacturer. He was not aware of the use of the name by anyone in the field of coherent remote sensing systems, however, and he decided on the name to describe all of the aspects of the business he envisioned for the company. Defendant adopted its corporate name to describe the kind of work in which it was engaged.

In the compilations of materials produced by scientific conferences, references to Defendant generally note the location of the company. For example, in an abstract of a paper delivered at a 1987 "Mini–Symposium on Fundamental Limits of Coherent LIDAR," Defendant's President is represented to be affiliated with "Coherent Technologies, Inc. Boulder, Colorado USA," and his name appears in a list of participants in that conference along with Defendant's name and address. In the June, 1989 edition of the trade magazine "Laser Focus World," a news article entitled "Solid-state lidar development promises longer lifetimes" refers to "[r]esearchers at Coherent Technologies, Inc. [ ] Boulder, Colo.;" it also refers repeatedly to Defendant as "CTI." Exh. P. Defendant's President was unaware of any materials prepared for use in his business or written about his business that stated the company name without its address.

Plaintiff's counsel engaged Philip Johnson ("Johnson") of Leo Shapiro and Associates, Chicago, to design and execute a telephone survey of Plaintiff's customers and potential customers to determine whether they were confused by Defendant's name. Employees of Survey Center Inc., a wholly

---

**4.** Entries in the Laser Focus Buyers' Guide must     be requested.

owned subsidiary of Leo Shapiro and Associates, polled 35 of Plaintiff's customers and 65 of its potential customers taken from a master list of about 1,400 customers and about 3,700 prospects that Plaintiff provided. Of course, phone interviews did not permit the interviewee to compare Plaintiff's graphic depiction of its mark and trade name and Defendant's trade name.

Johnson designed a survey that attempted to measure confusion in two ways. First, those who had heard of a company named "Coherent Technologies" were asked whether they knew where its headquarters or main office was located. Second, they were asked whether they knew how long Coherent Technologies had been in business.[5] Survey respondents held a wide variety of job titles.[6]

Overall, 59% of the respondents reported that they had heard of a company called Coherent Technologies. 41% reported that the headquarters or main offices of the company they were thinking of was located in California or Massachusetts, Plaintiff's location; 3% named a location other than California or Massachusetts, but none named Colorado, Defendant's location. Of Plaintiff's customers,[7] 86% reported that they were aware of Coherent Technologies; 71% reported that the headquarters or main offices of the company they were thinking of was located in California or

Massachusetts, Plaintiff's location; 3% named a location other than California or Massachusetts, but none named Colorado, Defendant's location. Of Plaintiff's prospective customers,[8] 45% reported that they were aware of Coherent Technologies; 25% reported that the headquarters or main offices of the company they were thinking of was located in California or Massachusetts, Plaintiff's location; 3% named a location other than California or Massachusetts, but none named Colorado, Defendant's location.

Dr. Kavaya, Defendant's vice president and chief scientist, has received calls on several occasions from salesmen responding to his requests for product literature who have asked whether Coherent Technologies was affiliated with Plaintiff.

## ANALYSIS & CONCLUSIONS OF LAW

Two legal issues are undisputed here. First, Plaintiff does not object to the use of the word "coherent" as an adjective in written materials and speeches to describe certain types of technology. Specifically, "Plaintiff does not object to defendant's use of the word 'coherent' to describe nouns, such as light, radiation, or even lasers, when the use of the word is not part of a trademark, service mark, trade name, or corporate name." Plaintiff's Post–Trial

---

5. As to this second measure of confusion, Johnson was trying to find out if the interviewees reported that the firm they believed to be Coherent Technologies was older than Defendant actually; when some of them did so, his inference was that the interviewees were really thinking of Coherent, Inc. (not Coherent Technologies) when they reported. However, Johnson compiled the results of the survey in such a way that does not assist the court. In his summary, Johnson states that, "Of the balance, 5% did not know the location of Coherent Technologies, but reported that they believed the company had been in business or they had become aware of it *more than five years ago,* again confusing it with Coherent, Inc." Exh. 36, at 6 (emphasis added). Both Plaintiff *and* Defendant had been doing business for more than five years as of the date the survey was taken, however. Therefore, no inference of confusion may be drawn from this data.

6. The titles and percentage of respondents holding them were: purchasing agent (18%), engi-

neer (15%), senior buyer (13%), chief project engineer (10%), project manager (10%), president of company (9%), owner of company (7%), professor (5%), physicist (3%), vice president (3%), research scientist (2%), general manager (1%), senior chemist (1%), graduate assistant (1%), laboratory assistant (1%), and lab technician (1%).

7. Johnson did not verify the customer list provided by Plaintiff. However, each person from the customer list who was contacted was asked whether he or she recalled purchasing anything from Coherent Technologies. 80% responded affirmatively.

8. Johnson did not verify the list of potential customer provided by Plaintiff. However, each person from the list of prospective customers who was contacted was asked whether he or she recalled purchasing something from Coherent Technologies. Some 10–12% responded affirmatively.

Brief at 2. Second, Defendant does not seek to invalidate Plaintiff's mark.

### I. Trademark or Service Mark Usage

■ It is undisputed that five of Plaintiff's six federal trademark or service mark registrations of the term "coherent" have become incontestable under § 15 of the Lanham Act, 15 U.S.C. § 1065 (1988). Generally, incontestable status permits a party to avail itself of the evidentiary presumption contained in 15 U.S.C. § 1115(b), which provides:

> To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be *conclusive evidence* of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065....

(1988) (emphasis added). The scope of this rule is limited by one exception relevant here,[9] which provides that an incontestable mark is conclusive evidence except in cases in which:

> ... the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party....

15 U.S.C. § 1115(b)(4) (1988). Fair use is a defense to incontestability in an infringement case. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 373, 375 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). Essentially, it

> forbids a trademark registrant to appropriate a descriptive term for his exclusive use and to prevent others from accurately describing a characteristic of their goods.

*Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). *See also Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1027 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); 1 J. McCarthy, *Trademarks & Unfair Competition* § 11:17, at 474 (2d ed.1984) (footnote omitted). Defendant claims that its use of the term "coherent" is a fair use of Plaintiff's marks under 15 U.S.C. § 1115(b)(4). Plaintiff denies this.

■ To prove the affirmative defense of fair use, Defendant must establish three elements: 1) Defendant is not using the term "coherent" as a trademark or service mark, 2) "coherent" is descriptive of the goods or services of Defendant, 3) that such descriptive use is fair and made in good faith. It is undisputed that Plaintiff uses the term "coherent" as a trademark on its lasers and laser systems, that it has done so since April 3, 1973, that it uses the term as a service mark, and that it has used the term as part of successive trade names since July 21, 1966.[10] Plaintiff ob-

---

**9.** Defendant initially raised affirmative defenses of laches, estoppel and acquiescence/waiver. Plaintiff objected to them, but withdrew its objection prior to trial, citing 15 U.S.C. § 1115(b)(8) (1988). Because Defendant did not put on evidence supporting any of these defenses, however, the court deems them to have been abandoned.

**10.** A "trademark" includes:
> any word, name, symbol, or device, or any combination thereof—
> (1) used by a person, or
> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127 (1988). In *Beer Nuts I*, the Tenth Circuit elaborated: "[a] trademark is a symbol that attracts public attention, is the most prominent element on the package, and dominates the package as a whole." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 938 (10th Cir.1983). It also stated that, "[a] term or symbol is used as a trademark when the producer uses it to identify the source of his goods to the public and to distinguish those goods from others." *Id.*

tained its first federal trademark registration of the word "Coherent" in 1978 and has obtained subsequently five additional federal trademark and service mark registrations; of these six federal marks, five are now incontestable under § 15 of the Lanham Act, 15 U.S.C. § 1065. Both parties concede that Defendant employs the "coherent" as part of its trade name and that Defendant does not use the term as a trademark.

In contrast, the issue of whether Defendant uses the term "coherent" as a service mark is hotly contested. Plaintiff claims that *Council of Better Business Bureaus, Inc. v. Better Business Bureau of South Florida, Inc.,* 200 U.S.P.Q. 282 (S.D.Fla. 1978), and *Mobil Oil Corp. v. Mobile Mechanics, Inc.,* 192 U.S.P.Q. 744 (D.Conn. 1976), support the conclusion that Defendant is using the term "coherent" as a service mark. The court disagrees. In *Better Business,* the defendant claimed that it was using the term "Better Business Bureau" in a descriptive sense. It used the disputed term prominently at the head of its stationery and as a main element of its logo which was "the centerpiece of its membership identification program." *Better Business, supra,* 200 U.S.P.Q. at 295. The court found defendant's claim to be "an utter distortion." *Id.*[11] In this case, Defendant does not feature the name so prominently as did the defendant in *Better Business.* Moreover, unlike the case at bar, there was no evidence in that case that the defendant displayed it in conjunction with its name and phone number.

The Lanham Act defines "service mark" as follows:
any word, name, symbol, or device, or any combination thereof—
(1) used by a person, or
(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter;
to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown....
15 U.S.C. § 1127.
"Trade name" "mean[s] any name used by a person to identify his or her business or vocation." 15 U.S.C. § 1127.

In *Mobil,* Mobil Oil Corporation, which provided to its customers, among other things, automotive service, road service and repair, brought suit against Mobile Mechanics, Inc., which provided automotive repair service. The defendant advertised in a way that highlighted one letter of its name in the same way that plaintiff did and the court found that defendant was using "mobile" as a service mark. In *Mobil,* there was no evidence that the defendant used its trade name alone as an attention-getting device. In this case, Defendant always displays its trade name, address and phone number together its advertising. Thus, both *Better Business* and *Mobil* are distinguishable.

A leading commentator has stated:

If a corporate name is used in full with its address on letterheads and advertising, it is probably not being used in a service mark sense. But if a company name, or a portion of that name, is used in connection with services so as to create a commercial impression separate from the name, then this is evidence of probable service mark usage.

1 J. McCarthy, *Trademarks & Unfair Competition, supra,* § 9:6, at 316–17 (internal footnotes omitted). Moreover, in *In re Unclaimed Salvage & Freight Co., Inc.,* 192 U.S.P.Q. 165, 168 (T.T.A.B.1976), an applicant sought to register as a service mark the notation "Unclaimed Salvage & Freight Co.," which it used in advertising. The Trademark Trial and Appeal Board affirmed refusal to register as service

**11.** The court there suggested that the only fair use defendant could make of the disputed term was in a sentence to describe its services. The court believes that this is an overly narrow construction of fair use. The case that the *Better Business* court cited to support this construction, *Venetianaire Corp. of America v. A. & P. Import Co.,* 302 F.Supp. 156 (S.D.N.Y.1969), *aff'd,* 429 F.2d 1079 (2d Cir.1970), did not reach the holding the court states that it did. *Venetianaire* merely stated that it would be a non-trademark use to describe products in a sentence using the disputed term. 429 F.2d at 1082. It did not foreclose other non-trademark or non-service mark uses of such a term.

mark because it merely served to identify applicant as a viable business entity. Defendant here is using "Coherent Technologies" in the same way as the application used its notation in *Unclaimed Salvage & Freight*. Therefore, I conclude that Defendant uses the term "coherent" as a part of its trade name only, not as a trademark or service mark.

The second element Defendant must prove is whether "coherent" is descriptive of its services. There was substantial, uncontradicted evidence that the business in which Defendant engages is the design and fabrication of coherent laser radar systems. Such systems are one of a number of technologies that depend on the quality of waves known as "coherence." Therefore, I conclude that "Coherent Technologies" describes the kinds of services Defendant provides for its clients.

The third element of the defense is that Defendant's descriptive use is made fairly and in good faith. As one commentator notes:

> The courts ordinarily analyze the use of the term and its nature in light of the surrounding circumstances, notably the defendant's good faith. In some instances the absence of good faith has made the defense unavailable to the defendant even though the term was clearly descriptive.

1 J. Gilson, *Trademark Protection & Practice* § 4.03[3], at 4–32.13—4–32.14 (1989). The evidence showed that when he selected the name of the company, Defendant's President knew of Plaintiff as a laser manufacturer. He believed that no one in the field of coherent remote sensing systems used this name, however, and he decided on the name to describe all of the aspects of the business he envisioned for the company. For example, Defendant utilizes coherent laser systems, coherent optics, coherent lidar, coherent imagery, coherent radiation and coherent detection. Moreover, there was no evidence suggesting that Plaintiff has been or is in the business of providing coherent laser radar services to its customers. I conclude that Defendant's descriptive use of the term "coherent" was made

fairly and in good faith. Defendant uses the word "coherent" in its primary descriptive sense. Defendant has established the affirmative defense of fair use defense under 15 U.S.C. § 1115(b)(4). Therefore, Plaintiff may not rest on the incontestability of its trademarks and service marks to prove infringement. *See Union Carbide Corp., supra,* 531 F.2d at 373, 375.

II. *Trademark Infringement*

■ Plaintiff has brought its claim under § 32(1) of the Lanham Act, which provides, in pertinent part:

> Any person, who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1) (1988). "Under the Lanham Act, use of a mark constitutes infringement of a registered trademark and leads to liability if it 'is likely to cause confusion' in the marketplace concerning the source of the different products.'" *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 924 (10th Cir.1986) (*Beer Nuts II*), quoting 15 U.S.C. § 1114(1)(a). *See also Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 940 (10th Cir.1983) (*Beer Nuts I*) (citation omitted).

In determining the likelihood of confusion, the court may consider several factors:

"(a) the degree of similarity between the designation and the trade-mark or trade name in

  (i) appearance;

  (ii) pronunciation of the words used;

  (iii) verbal translation of the pictures or designs involved;

  (iv) suggestion;

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed the other.

(d) the degree of care likely to be exercised by purchasers."

*Beer Nuts I, supra,* 711 F.2d at 940, *quoting* Restatement of Torts § 729, at 592–93 (1938). "[T]hese factors are interrelated and must be considered as such in assessing the likelihood of confusion." *Beer Nuts II, supra,* 805 F.2d at 925. Since the Restatement list is not meant to be exhaustive, *id.,* I will consider two additional relevant factors: actual confusion and the likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979).

## A. *Degree of Similarity*

The first prong of the Restatement test concerns the similarity of sight, sound and meaning of Plaintiff's marks and Defendant's trade name. *See Beer Nuts I, supra,* 711 F.2d at 940. As one commentator puts it,

Consumers under actual product selection circumstances rarely analyze trademarks minutely or compare their various elements. The courts attempt to place themselves in the same position and to recreate the likely consumer reaction to the overall impact of the mark.

la J. Gilson, *Trademark Practice & Protection, supra,* § 5.03, at 5–69. In considering similarity, the court looks at the terms in their entirety. *Id.* § 5.03, at 5–68.

Defendant's trade name incorporates the Plaintiff's mark, and as part of that trade name, the word is pronounced the same way. The scientific meanings of the term "coherent" in Plaintiff's trade name and marks and in Defendant's trade name are identical. In *Marker Int'l v. deBruler,* 635 F.Supp. 986, 999 (D.Utah 1986), *aff'd,* 844 F.2d 763 (10th Cir.1988), the district court stated:

A defendant in a trademark infringement or unfair competition case cannot prevail by simply adding a word to the one it shares with the plaintiff. "Courts have repeatedly held that the confusion created by use of the same word as a primary element in a trademark is not counteracted by the addition of another term."

(quoting *Continental Connector Corp. v. Continental Specialties Corp.,* 492 F.Supp. 1088, 1095 (D.Conn.1979)). Plaintiff frequently displays the word "Coherent" with a "bug" symbol, whereas Defendant's full trade name is accompanied by its address and phone number, thus differentiating them. Nonetheless, on the basis of sight, sound and meaning, I conclude that Plaintiff's mark and Defendant's trade name are similar.

## B. *Defendant's Intent*

The Tenth Circuit has stated:

The "deliberate adoption of a similar mark may lead to an inference of intent to pass of goods as those of another which in turn supports a finding of likelihood of confusion." *Beer Nuts II, [supra,]* 805 F.2d at 927. "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 431 (5th Cir.1984); *accord* Restatement of Torts § 729 comment f at 594–95 (1938). A conscious choice of a mark similar to a mark already established in the marketplace usually supports a finding of a likelihood of confusion "because the court presumes that [the alleged infringer] 'can accomplish his purpose: that is, that the public will be deceived.'" *Beer Nuts I, [supra,]* 711 F.2d at 941 (quoting *AMF Inc.[, supra,* 599 F.2d at 354]).

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1485–86 (10th Cir. 1987). The Lanham Act provides that every trademark registered on the principal

register is constructive notice of the registrant's claim of ownership. 15 U.S.C. § 1072 (1988). Plaintiff registered its first mark with the U.S. Patent and Trademark Office in 1978. At that point, Defendant was on constructive notice that Plaintiff claimed ownership of the mark "Coherent." However, Defendant selected the name "Coherent Technologies" to describe the kind of work in which it engages. It has not and does not use the term "coherent" as a service mark. Moreover, Plaintiff sells its products and services and Defendant sells its services to different markets through different channels. *See infra* at 1065. I conclude that Plaintiff has failed to show that Defendant made the decision to adopt "Coherent Technologies, Inc." for its coherent lidar business in bad faith or that it intended to pass off its services as those of the Plaintiff.

### C. *Relation in Use and Manner of Marketing between the Goods or Services Marketed by the Parties*

The products or services sold by the parties are somewhat related. Plaintiff develops, manufactures and sells a wide variety of laser products and laser systems and provides services related to the use of its products. Defendant develops and markets services only in the form of coherent laser radar systems. Plaintiff does not provide coherent laser radar systems to its customers and Defendant has never developed, manufactured or sold laser products. Plaintiff's products may be used in the types of services that Defendant offers, however, and to that extent they are related.

The evidence showed that the customers to which each party sells its products or services overlap somewhat. Although Plaintiff's largest single direct customer is a private Japanese firm, its largest single indirect customer is the Government; one of its indirect customers is the Department of Defense. If sales to all Government agencies is totalled, the Government is also its largest direct customer. Defendant provides its services directly to such Government agencies as the National Aeronautic and Space Administration and the

Department of Defense, as well as to entities interested in the commercial product development of lidar systems. It does not sell its services through intermediaries. Although both parties sell their products and/or services to the Government and, more specifically, to the Department of Defense, it is unclear whether Plaintiff and Defendant sell their products and/or services to similar agents within the Government entities with which they do business such that these customers were likely confuse Plaintiff's marks and trade name and Defendant's trade name.

The channels through which Plaintiff and Defendant market their goods or services differ significantly. Both parties have placed entries in the Laser Focus Buyers' Guide, which contains a listing of firms providing laser and laser-related products and/or services. The similarity ends there, however. Plaintiff generally advertises its products through mass-produced catalogs and brochures and through calls by sales representatives. Defendant does not have any sales representatives, but relies instead on solicitations by those in the coherent lidar field and on the acceptance of proposals that it submits upon learning of the availability of projects. It has produced a capabilities brochure, but the distribution has been limited to several dozen clients and prospective clients.

Plaintiff and Defendant are not economic competitors. Overall, the similarity in the manner of marketing of the goods or services marketed by the parties is minimal.

### D. *Sophistication of and Care Exercised by Purchaser*

The job descriptions of respondents to Plaintiff's own survey, see *supra* at 1060 n. 6, support the inference that those to whom Plaintiff sells its products are relatively sophisticated. Plaintiff points out that expertise in the field does not insure a lack of confusion of trademarks. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir.) (citations omitted), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970). In this case, however, there is good reason to be-

lieve that Plaintiff's customers are sophisticated and exercise a great care in their purchasing. A note to Restatement of Torts § 729 states,

> The buying habits of the purchasers of the particular goods in question are also significant. *If the goods are bought by purchasers who exercise considerable attention and inspect fairly closely, the likelihood of confusion is smaller than when the goods are bought by purchasers who make little or no inspection.*

Restatement of Torts § 729, comment g at 596 (emphasis added). Plaintiff's products and services sell for between several hundred dollars and $1.5 million; the average cost of its laser products is between $50,000–75,000. Moreover, those laser products are precision instruments, the purchase of which depends upon exacting specifications. Therefore, the decision to purchase demands great attention to the capabilities of the product at issue and the needs of the project for which the agent is buying it. It follows that the same holds true for the related services that Plaintiff provides. Therefore, I conclude that Plaintiff's customers are sophisticated and exercise great care in their purchase of its products and services.

### E. *Actual Confusion*

The Tenth Circuit has pointed out that "[o]bviously, the best evidence of a likelihood of confusion is actual confusion." *Jordache, supra,* 828 F.2d at 1487, *citing Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 74 (10th Cir.1958). However,

> While evidence of actual confusion supports a finding of likelihood of confusion, absence of such evidence does *not* necessarily support a finding of *no* likelihood of confusion, especially when the products involved are inexpensive.

*Beer Nuts II, supra,* 805 F.2d at 928 (original emphasis; internal citations omitted). In this case, as previously mentioned, Plaintiff's products are expensive.

Plaintiff attempted to show actual confusion in two ways. First, it presented the evidence of Defendant's vice president and chief scientist, Dr. Kavaya, who reported that he had received calls on several occa-

sions from salesmen responding to his requests for product literature. They asked him whether Defendant was affiliated with Plaintiff. Such evidence does not persuade the court that actual confusion has occurred. First, as to third party communications, one commentator has written:

> Some courts have found evidence of such [customer] enquiries as evidence of actual confusion. But other courts have said that a question as to possible affiliation reveals that the questioner had the difference in mind or else would not have bothered to even enquire. The better view would seem to be that while enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion. Such enquiries alone reveal a less than totally "confused" state of mind of the enquiring persons.

2 J. McCarthy, *Trademarks & Unfair Competition, supra,* § 23:2, at 54 (internal footnotes omitted). *Cf. Jordache, supra,* 828 F.2d at 1487 (adopting McCarthy's "better view" and holding that "even when combined with other evidence inquiries to the plaintiff about the source of a product are of comparatively little value."). Second, those who allegedly were actually confused were sellers of products to Defendant, not buyers of Plaintiff's products or services. Since they were not in the relevant universe of customers or potential customers, their confusion, if it existed, was irrelevant.

The second means by which Plaintiff attempted to demonstrate actual confusion was a survey of its customers and potential customers. The Tenth Circuit has acknowledged that public recognition surveys can be used to demonstrate actual confusion. *Jordache Enterprises, supra,* 828 F.2d at 1487; *Standard Oil, supra,* 252 F.2d at 75. Defendant claims that the court should give little if any weight to the survey's indication of confusion because it did not simulate actual market conditions in which interviewees were "in a buying mood." 2 J. McCarthy, *Trademarks & Unfair Competition, supra,* § 32:48, at 770. However, the "buying mood" view as to the weight

of survey evidence has been criticized persuasively in that such a view essentially rejects all surveys absent perfect reproduction, and likely confusion of purchasers does not define the only type of confusion that may be relevant; confusion of non-purchasers (*e.g.* potential customers) may also be important. As one commentator states:

> The better view is that the closer the survey context comes to market place conditions, the greater the evidentiary weight it has....
>
> Surveys taken at home in person or by telephone should not be discounted or denigrated, but accepted as probative evidence if properly conducted.... Telephone surveys have been criticized by some courts, but accepted by most. The only inherent deficiency in a telephone interview is that the visual component is missing.

2 J. McCarthy, *Trademarks & Unfair Competition, supra,* § 32:48, at 771–72 (internal footnotes omitted).

The utility of the survey in the present case is limited. It measured confusion in only one way that is meaningful to the court's analysis. *See supra* at 8 n. 5. It is true that a substantial percentage of Plaintiff's customers and potential customers (41%) appear to have been confused between the parties based on the location of Plaintiff's headquarters or main offices as those of "Coherent Technologies." However, such confusion about the headquarters does not establish actual confusion in the marketplace, where Plaintiff and Defendant sell substantially different products and/or services through different means. Finally, the survey failed to describe Defendant as it is described in its advertising, namely, by its trade name, address and phone number. Had it done so, the survey would have simulated conditions in the marketplace more accurately, and the level of confusion—if it existed at all— would have been lower. Therefore, I conclude that the survey does not establish actual confusion.

### F. *Expansion into Another Product Line*

Plaintiff produces lasers that may be used in Defendant's coherent lidar systems. In uncontradicted testimony, however, Defendant's President testified that his company does not sell lasers and does not plan to do so. There was no evidence that Plaintiff planned to enter Defendant's field of business.

After considering all of the foregoing factors, I conclude that Plaintiff has failed to demonstrate likelihood of confusion by a preponderance of the evidence. Therefore, it cannot prevail on its trademark infringement claim.

### III. *False Designation of Origin*

■ Plaintiff's other federal claim for relief was false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This section provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods or services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

This section proscribes not only acts that technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception. *Holiday Inns, Inc. v. Trump,* 617 F.Supp. 1443, 1466 (D.N.J.1985). "As with the in-

fringement claims, the key to establishing a claim of false designation of origin lies in proving that defendant's use of a trademark or packaging creates a likelihood of confusion." *Schering Corp. v. Schering Aktiengesellschaft*, 667 F.Supp. 175, 187 (D.N.J.1987) (citation omitted), *vacated on other grounds*, 709 F.Supp. 529 (D.N.J. 1988). This confusion may concern either the source, origin, the endorsement or sponsorship of the product or service. *Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. 477, 482 (S.D.N.Y.1983) (citations omitted). "The same facts which substantiate an action for trademark infringement under § 32 of the Trademark Act of 1946, 15 U.S.C. § 1114, will make out an action for false designation of origin under § 43." *Id.* For the reasons stated in Part II of this opinion, I conclude that Plaintiff has failed to demonstrate such confusion.

IV. *Unfair Competition*

Plaintiff has also contended that Defendant's use of the term "coherent" is unfair competition at common law. The legal test for unfair competition is similar to that for federal trademark infringement and false designation of origin, *i.e.*, whether the public is likely to be deceived. *See Swart v. Mid–Continent Refrigerator Co.*, 145 Colo. 600, 360 P.2d 440, 442 (Colo.1961). In determining whether the use of the same or similar name is unfair, the Colorado Supreme Court has stated:

> Where ... there is similarity of trade names, the question to be determined is whether the trade is being unfairly diverted and whether the public is deceived in purchasing from one merchant believing it is patronizing another. That no merchant should be permitted to sell his goods and represent them as those of another or to profit unfairly from the good-will established by his business rival is clear.

*American Furniture Co. v. American Furniture Co.*, 128 Colo. 160, 261 P.2d 163, 166 (1953) (en banc). *See also Wood v. Wood's Homes, Inc.*, 33 Colo.App. 285, 519 P.2d 1212, 1214 (1974). For reasons stated in part II of this opinion, I find that Plaintiff has not demonstrated by a preponder-

ance of the evidence that Defendant's use of the term "coherent" constitutes common law unfair competition.

Accordingly,

IT IS ORDERED that the Clerk shall enter final judgment in favor of the Defendant and against the Plaintiff.

IT IS FURTHER ORDERED that each party bear its own costs and attorney fees.