**BIRTCHER ELECTRO MEDICAL SYSTEMS, INC., a Colorado corporation, and the Birtcher Corporation, a California corporation, Plaintiffs,**

v.

**BEACON LABORATORIES, INC., a Minnesota corporation, Defendant.**

**Civ. A. No. 90–B–0432.**

United States District Court, D. Colorado.

May 25, 1990.

418

James E. Hartley, Holland & Hart, Denver, Colo., for plaintiffs.

George G. Matava, Sheridan, Ross & McIntosh, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Before me is Birtcher Electro Medical Systems, Inc. (formerly Bard Electro Medical Systems, Inc.) and The Birtcher Corporations' (collectively Birtcher) Motion for Preliminary Injunction. In its complaint, Birtcher alleges that Beacon Laboratories, Inc. (Beacon) committed (1) patent infringement, (2) statutory and common law trademark infringement and (3) various acts of unfair competition in developing and marketing a medical device used to promote blood coagulation around an incision during surgery. Birtcher's motion for preliminary injunction does not seek relief under the patent claim.

The parties presented evidence and legal argument to the court on February 26, 27 and May 8, 1990. Because Birtcher failed to make a showing sufficient to warrant a preliminary injunction, on May 18, 1990 I denied the motion. The following constitutes my findings of fact and conclusions of law.

To qualify for a preliminary injunction, Birtcher must establish that (1) there is a substantial likelihood that it will succeed on the merits, (2) it will suffer irreparable injury absent an injunction, (3) the threatened injury outweighs the damage the preliminary injunction would cause Beacon and (4) the preliminary injunction would not be contrary to the public interest. *Seneca–Cayuga Tribe v. Oklahoma,* 874 F.2d 709, 716 (10th Cir.1989). I look to the claim for trademark infringement and the claim for unfair competition separately to determine if a preliminary injunction is warranted under either theory.

## I. FINDINGS OF FACT

The controversy involves an electrosurgical device used to coagulate blood flowing from cut tissue. The device uses argon gas which is ionized by a flow of radio frequency electrical energy. The ionized argon gas and electrical energy feed through a handheld instrument resembling a pencil. The device is activated when held approximately one or two centimeters from the target tissue. The swift stream of argon gas forces away any fluids from the cut tissue, providing a relatively clean tissue surface on which the electric energy coagulates the blood. The argon gas, having been ionized by the electricity, emits light, creating a visible beam. Because the beam of light allows the operator to see exactly where the flow of gas and energy from the instrument is directed, the operator can use the instrument precisely.

Both Birtcher and Beacon have developed and marketed versions of the device. Birtcher's device is significantly more expensive than Beacon's because the Birtcher device includes an electrical generator while the Beacon device allows for use of a customer's existing external generator.

### A. *Statutory and Common Law Trademark Infringement*

Since 1987, when Birtcher formally introduced its device at the annual convention of

the American College of Surgeons (ACS), Birtcher used various terms to identify its device, including (1) "Argon Beam Coagulator," (2) "ABC," (3) "System 6000" and (4) "Beam." Since 1989, when Beacon first began to sell its device, it used the term "Beamer One" and at times described the device as an "Argon Beam Coagulator." Birtcher contends that Beacon has violated its statutory and common law trademark rights. In its motion for preliminary injunction, Birtcher seeks an order enjoining Beacon from using the word "Beam" or any similar term including the phrase "Argon Beam" to describe the Beacon device.

Beacon argued that "Argon Beam Coagulator," "Argon Beam" and "Beam" are generic and not protectable as trademarks. ("ABC" is a registered mark and Birtcher claims no infringement of it). Alternatively, Beacon contended that those terms are descriptive without secondary meaning. Beacon further contended that even with secondary meaning, there is no likelihood of consumer confusion.

### 1. Suggestive, Descriptive or Generic

■ To establish trade mark status for the "Argon Beam Coagulator," "Argon Beam" and "Beam," Birtcher first presented evidence that Birtcher frequently used those terms in marketing literature to refer to its product. Julie Dawson, Birtcher's Marketing Service Manager, testified that, because much of the literature was written before Beacon introduced its device, the terms necessarily referred exclusively to Birtcher's device.

Beacon agreed that Birtcher used those terms regularly. However, Beacon's evidence established that the terms were not used *as trademarks* and that, until now, Birtcher never intended that the terms acquire trademark status. Beacon showed numerous instances in which Birtcher literature and videotaped advertising used the terms as nouns as opposed to adjectives, indicating that the terms were generic labels for the product itself. For example, in a document authored by Birtcher for a direct mailing campaign to approximately 30,000 surgeons, Birtcher described its de-

vice as the "Bard® ABC™ Argon Beam Coagulator."

Furthermore, Birtcher's inhouse counsel, Lois Rittenhouse, understood the correct use of trademarks to indicate when Birtcher expected protection. Nonetheless, much of the literature prepared by Birtcher used the terms as nouns and none of the publicly disseminated literature designates the terms as trademarks by using a "™" signal. Notably, there were examples of documents, which were being drafted for public release, that designated "Argon Beam Coagulator" as a trademark by using the "™" symbol. However, before releasing the documents to the public, Birtcher removed the trademark designation.

Finally, in spite of its stringent trademark control policy, Birtcher never applied for trademark registration of any of the terms. Although in various marketing meetings and proposals Birtcher considered adopting the term "Beam" for its device, Birtcher abandoned the idea and only the mark "ABC" was registered because "Beam" was "too descriptive."

Birtcher typically capitalized the initial letters in the phrases "Argon Beam Coagulator" and "Argon Beam," and occasionally the term "Beam." However, Beacon presented numerous examples of other phrases which Birtcher indiscriminately had capitalized initial letters but to which Birtcher claimed no trademark protection. Beacon established that Birtcher never intended to use the terms as trademarks and only rarely used them as trademarks. Thus, the consuming public is unlikely to have interpreted the terms as indications of the product's source.

Even if Birtcher coined the phrase "Argon Beam Coagulator," that does not necessarily signify Birtcher's intent or belief that the phrase has trademark status. Because the product was the first on the market, it had no generic name until Birtcher gave it one. By using the phrase "Argon Beam Coagulator," not as a trademark, but as a generic designation, Birtcher gave the device a common label.

Other evidence was persuasive that the terms are generic. "Argon Beam Coagula-

tor" is a wholly accurate phrase to depict the elements and function of the device. The device uses a stream of *argon* gas, which is ionized by an electrical current and emits a *beam* of light allowing the operator to accurately apply the electrical energy and *coagulate* blood on the target tissue. Although the term may sound somewhat fanciful to the common ear, to the sophisticated market (surgeons, operating room nurse supervisors and hospital purchasing committees), the phrase is nothing more than the name of a product type.

Likewise, "Argon Beam" is no less generic simply because it omits the word "coagulate." Birtcher presented testimony that "arc" is a more precise generic term than "beam" to describe the light emitted from the device. However, Birtcher did not show that this single phenomenon could not have multiple generic names.

Beacon also introduced articles from scientific journals that used the terms generically, as individual words and complete phrases. For example, in one article, the author wrote "[a] new argon beam coagulator (ABC) device (Bard ABC System 6000, Bard Electro Medical Systems, Englewood, Colo) has recently been developed." Ward, Castro & Ward, *A Significant New Contribution to Radical Head and Neck Surgery*, 115 Arch Otolaryngol Head Neck Surg. 921 (1989). This evidence supports Beacon's claim that the terms are not suggestive or descriptive, but generic.

## 2. Secondary Meaning

■ As discussed below, to qualify for trademark protection, descriptive marks must have attained secondary meaning. Although I have found that the terms here are generic and incapable of trademark status with or without secondary meaning, whether the terms did have secondary meaning is still relevant in the context of preliminary injunction for the purpose of determining Birtcher's likelihood of success.

To show secondary meaning, Birtcher presented (1) testimony of surgeons indicating that they associated the terms with the Birtcher device, (2) evidence of expense and effort expended by Birtcher in promoting the device and using the terms and (3) argument that, because Birtcher was the sole producer of the device, the terms necessarily acquired secondary meaning.

Birtcher introduced the depositions of only six surgeons who testified that they understood "Argon Beam Coagulator" to refer to Birtcher's device. Beacon introduced its own anecdotal evidence of surgeons who associated the terms only with the device, not the producer. Given this conflict among these few doctors, I find Birtcher's evidence of secondary meaning unconvincing. Furthermore, Birtcher's own expert on trademark law, David Weinstein, testified that the word "beam" eventually *could* attain trademark status, but had not done so.

In promoting its device, Birtcher spent over three million dollars. Birtcher advertised by direct mailings to hospitals, attended medical supply conventions advertised through the press and engaged in other efforts to place its product prominently in the marketplace. However, because Birtcher failed to use the marks as trademarks, the evidence of promotional expenditure is not persuasive to establish secondary meaning. I cannot infer that the consuming public associates the terms with Birtcher because of the extensive advertising when the advertising itself often failed to make the association.

■ Finally, Birtcher presented evidence that it used the terms "Argon Beam Coagulator," "Argon Beam" and "Beam" before any similar device was on the market. From this, Birtcher argued that the terms *necessarily* acquired secondary meaning. There is a superficial appeal to this logic: in a single source market, especially where the term is descriptive, the consumers will associate the mark with the product (the mark, after all, describes the product) and associate the product with the source (the product, after all, is produced by only one source). Therefore, according to Birtcher, consumers must associate the mark with the source.

Although the relationship between source, product and mark may be transitive while there is a single producer, the relationship breaks down immediately when a new product source enters the market. Hence, the theory is fallacious, because the claimed necessary secondary meaning exists only while there is no other producer and no other infringer. Thus, I decline to find that the descriptive terms used by a single source producer to market its product are graced with inherent secondary meaning upon the entrance of a new source for the product.

### 3. Likelihood of Consumer Confusion

■ Assuming the terms are descriptive with secondary meaning, also relevant to Birtcher's prospect of success is whether Beacon's use of "Beamer One" created a likelihood of consumer confusion. As to this issue, I assume that "Argon Beam Coagulator," "Argon Beam" and "Beam" are descriptive with secondary meaning. Nonetheless, Birtcher presented insufficient evidence to show likelihood of confusion.

Birtcher presented no survey evidence to establish likelihood of consumer confusion. Instead, it presented examples of actual confusion. The most telling illustration of consumer confusion came from a potential customer who called Birtcher, apparently believing she had called Beacon, asking to speak to a representative "concerning the Birtcher Beacon Beamer One Argon Coagulator." In spite of Birtcher's handful of examples, on the evidence, I find that confusion is unlikely between Beacon's term "Beamer One" and Birtcher's terms "Argon Beam Coagulator," "Argon Beam" and "Beam."

The devices each prominently carry their respective house marks, significantly reducing the likelihood of confusion where, as here, the relevant consuming public is highly sophisticated. The phrase "Beamer One" is easily distinguishable from "Beam." Although there is a common root to both terms, "Beamer One" is enough of a variation of the root that consumers can perceive the dissimilarities. Furthermore,

there was no evidence that Beacon had corrupt intent in adopting its designation. Especially here, where the product is expensive, the consumers sophisticated, and the purchases made only after detailed research and in-hospital evaluation, "Beamer One" is not likely to be confused with "Beam."

### B. *Federal and State Unfair Competition*

Birtcher alleges that certain of Beacon's actions in marketing its device violated (1) Lanham Act, § 43(a) (15 U.S.C. § 1125(a)) and (2) Colo.Rev.Stat. §§ 6-1-105(1)(a), (b), (c), (e), (g) & (h).

### 1. False Claims of Product Equivalence

■ Birtcher alleged that Beacon falsely told potential customers that the Beamer One was equivalent to the Birtcher device. As evidence, Birtcher introduced a transcript of an in-service presentation by a Beacon employee to a potential customer. The Beacon sales representative stated that the Beamer One "would do the same exact thing" as the Birtcher device.

To establish that this was a false claim, Birtcher presented testimony of William Bowers, Product Development Manager for Birtcher, regarding Birtcher testing of the Beamer One. Bowers identified some differences between the Beacon device and the Birtcher device: (1) the Beamer One had no automatic regulation of the gas/wattage ratio, (2) the Beamer One does not have a built-in electric generator and (3) the Beamer One is less expensive than the Birtcher device.

Based on the structural differences, Birtcher argued that the Beamer One will not, as the Beacon salesman represented, "do the exact same thing" as the Birtcher device. Further, Birtcher contended that Beacon literature claiming that, with an electric generator, the Beamer One becomes an "Argon Beam Coagulator" also misrepresents the quality and source of the device.

Birtcher claimed that its device has certain safety features that are absent on the Beacon device. Specifically, Birtcher

presented a medical study completed by Dr. Van Way indicating that there may be a risk of emboli (gas bubbles entering the blood stream) if the argon-gas/electrical-wattage ratio is too high. The study was conducted at Birtcher's request because of concerns expressed by the Food and Drug Administration over potential health risks of the device. Birtcher learned of the results of the study in the fall of 1987. The study recommended:

> First, the gas only mode should be eliminated. It provides little advantage and is potentially dangerous. Second, the maximum flow rate of the machine should be set at [10 liters per minute]. Third, the internal programming should ensure that 40 watt power can only be used with gas flow levels of 4, 6 and 8 [liters per minute], while [10 liters per minute] should require a minimum of 80 watts of power. Operated within these limits, the machine appears to be safe and will not produce ·significant gas emboli.

Birtcher incorporated in its device circuitry to comply with these recommendations.

Beacon presented credible evidence that the sales representative's statement that the machines were equivalent referred to only the clinical effects of the two machines and that indeed the clinical effects of the two machines are comparable in spite of Birtcher's embolism argument. Although Beacon did not deny that its machine can be operated outside the limits recommended in the study, testimony from Dr. Van Way explained that the study was inconclusive, having been conducted under an acute time constraint. Dr. Van Way further testified that the study did not show that exceeding the recommended gas/wattage ratio limits was necessarily dangerous, only there was almost no risk of emboli if the device was operated within the limits. Beacon also presented testimony that, even assuming a risk inherent in the device, it is safe in the hands of a competent surgeon trained in its use.

The evidence of whether the Beacon device is inferior to the Birtcher device was conflicting. However, given that the marks used by Birtcher are at best very weak, it is unlikely that consumers will confuse the products and associate Beacon's machine with Birtcher's. Further, given my conclusion that "Argon Beam Coagulator," initial letters capitalized or not, is generic and has no secondary meaning, Beacon's claim in its literature that the Beamer One would "convert most electrosurgical generators ... into an Argon Beam Coagulator" was not deceptive.

I find that Beacon did not misrepresent characteristics or origin of its machine or Birtcher's machine.

2. Dissemination of Testimonials and Birtcher's Clinical Reports

■ In a marketing brochure, Beacon printed a testimonial from Dr. John Bell–Thompson stating that the "Beamer One is a vast improvement over conventional electrocautery...." There was conflicting testimony whether Dr. Bell–Thompson authorized the quotation. The. Beacon employee in charge of obtaining permission testified that Dr. Bell–Thompson's secretary told him that Dr. Bell–Thompson consented to Beacon publishing the quotation. In deposition testimony admitted at the hearing, Dr. Bell–Thompson testified that, although he could not recall giving permission to Birtcher to use the quotation, it accurately reflected his opinion. Under these circumstances, this publication did not constitute unfair competition.

Beacon admits that in its marketing efforts, it distributed clinical reports paid for by Birtcher (then Bard) evaluating Birtcher's device. The reports were written by different surgeons applying the Birtcher device in various specific surgical procedures. Beacon sales representatives testified that they obtained copies of the reports at trade shows from Birtcher and that the clinical reports were only distributed to potential customers who requested scientific evaluation of the product.

Furthermore, Richard Fleener, the president and founder of Beacon, testified that Beacon representatives always made clear that the clinical reports were from Bard. The clinical reports carried the Bard name and Beacon made no effort to delete or

obscure the mark from the reports when distributing them to potential customers. Birtcher conceded that the reports, although paid for by Bard, belong to the authors and that Birtcher has no copyright to them. Beacon has since ceased distributing the reports. The evidence established that Beacon had no intent to and did not pass-off Bard's clinical reports as its own.

### 3. Customer Solicitation

■ Birtcher established that from October 1989 through January 1990, Beacon successfully placed a Beamer One for evaluation or sale in fourteen hospitals. Twelve of those hospitals had previously been contacted by Birtcher. However, there is no persuasive evidence Beacon appropriated any customer lists or confidential information.

Each instance of Beacon following on the footsteps of Birtcher can be and was explained without resort to speculation that Beacon appropriated any trade secrets. Many of the hospitals that Birtcher contacted had connections to Valleylabs, a company for which Richard Fleener and other Beacon sales representatives worked before Beacon was established. These ties to Valleylabs, although informal, remain and Valleylabs continues to be a source of marketing information for Fleener and Beacon.

Additionally, as Birtcher recognized, the names of potential clients are available through many public lists. Finally, Birtcher and Beacon attended the same trade shows. Both companies would make the same business contacts at the shows. Given these credible explanations, I find that Beacon has not misappropriated confidential customer information from Birtcher or misinformed potential customers as to the quality or source of its product.

### 4. Hiring of Former Birtcher Employees

■ The claim that Beacon raided Birtcher of its employees was not supported by the evidence. Beacon now employs four former Birtcher employees. However, there was no evidence that Beacon improperly lured those employees away from Birtcher. As Birtcher's president testified, upon its purchase of Bard Electro Medical Systems, Birtcher reduced its number of staff to help solve its cash flow problem. Three of the four former Birtcher employees had been laid off by Birtcher as a result of the cost-cutting. They joined Beacon only after they were laid off by Birtcher. The fourth former Birtcher employee quit her job at Birtcher before joining Beacon without any encouragement or solicitation from Beacon.

Birtcher presented some testimony that Beacon employees contacted Birtcher employees and discussed job opportunities. However, other than the four employees discussed above, no Birtcher employee has left to join Beacon. Furthermore, the uncontested testimony of Richard Fleener was that Beacon instructed the former Beacon employees not to disclose any of Birtcher's confidential information.

One of Birtcher's former employees who joined Beacon admitted possessing four notebooks with the Bard mark on the covers. However, he testified that the contents of the notebooks were his and non-confidential. One of the notebooks contained photocopied published articles and book reviews. A second contained literature distributed to the public by Beacon competitors. A third contained medical journal articles and the fourth published materials on electrosurgical procedures. Although some of the materials dealt with Birtcher sales representative training techniques, the employee testified that all the information was publicly available.

## II. CONCLUSIONS OF LAW

### A. *Statutory and Common Law Trademark Infringement*

When the defense of genericness is raised to an unregistered term, the party seeking trademark protection bears the burden of proving trademark status. *See National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464

U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). A generic mark is not entitled to trademark protection. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir. 1983). A descriptive mark is entitled to trademark status only if it has acquired secondary meaning. *Id.* at 940. Infringement of a descriptive mark with secondary meaning occurs when the use of a similar mark is likely to cause confusion in the marketplace concerning the source of the different products. *Id.*

Birtcher is unlikely to establish that the terms are not generic. Even if Birtcher were likely to make the showing that the terms were descriptive and not generic, it will probably not establish that the terms acquired secondary meaning. Finally, assuming that the terms are descriptive with secondary meaning, Birtcher probably will not be successful in establishing that Beacon's use of "Beamer One" is likely to cause consumer confusion. Thus, I conclude that Birtcher is not likely to succeed on its trademark claims. *See Coherent, Inc. v. Coherent Technologies, Inc.*, 736 F.Supp. 1055 (D.Colo.1990).

■ Nor did Birtcher make a sufficient showing of irreparable injury. Birtcher did not establish that its good will or business reputation had been or would be adversely affected by Beacon's use of the generic terms "Argon Beam Coagulator," "Argon Beam" or "Beam." Beacon, on the other hand, presented convincing evidence that as a start-up company it is currently chartering through rough financial waters. A preliminary injunction prohibiting Beacon from using the terms would force Beacon to expend its scarce resources to develop and produce new marketing materials. An injunction would impose a serious financial hardship on Beacon.

The public interest would suffer if I issued a preliminary injunction here. On the showing made, preventing entrants in the gas coagulation field from using "Beam" or "Argon Beam Coagulator," or derivations thereof, would delete the phrases and terms from the lexicon of market language and yet would not be accompanied by a corresponding public benefit of decreasing consumer search costs. *See* Carter, *The Trouble with Trademark*, 99 Yale L.J. 759, 787–88 (1990); Landes & Posner, *Trademark Law: An Economic Prospective*, 30 J.L. & Econ. 265, 268–70 (1987). To that extent, the public would be injured by grant of legal protection to generic marks, or descriptive marks that lack secondary meaning. Carter at 763.

### B. *Federal and State Unfair Competition*

None of the conduct by Beacon rises to the level of unfair competition under the Lanham Act or the Colorado deceptive trade practices statute. To recover for violation of federal or Colorado unfair competition, Birtcher must establish that (1) Beacon placed in commerce and falsely represented the source or quality of its goods, (2) Birtcher is likely to be harmed by Beacon's false representations and (3) Beacon's misrepresentations are likely to confuse or deceive the public as to the source of its product. *See Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131, 136 (D.Colo.1980) (Kane, J.).

Beacon's claim that its device is clinically equivalent to the Birtcher device is not deceptive. Nor was Beacon's use of Dr. Bell–Thompson's testimonial. Even assuming that Dr. Bell–Thompson did not consent to the quotation, he does not protest its accuracy. Beacon no longer distributes the clinical studies. Birtcher failed to show that there was anything unlawful about Beacon's customer solicitation or that Beacon obtained confidential Birtcher information by hiring former Birtcher employees.

Finally, Birtcher may still have a claim for unfair competition where Beacon uses a term such that it is likely to confuse consumers, even if the term is without trademark status. *Ames Publishing Co. v. Walker–Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa.1974). In determining whether Beacon's mark is likely to cause confusion in the marketplace concerning the source of the product, I consider a variety of factors, none of which is conclusive, including:

(a) the degree of similarity between the designation and the trade-mark or trade-name in

(i) appearance;

(ii) pronunciation of the words used;

(iii) verbal translation of the pictures or designs involved;

(iv) suggestion;

(b) the intent of [Beacon] in adopting the designation;

(c) the relation in use and manner of marketing between the goods ... marketed by [Beacon] and those marketed by [Birtcher];

(d) the degree of care likely to be exercised by purchasers.

*Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir.1983) (quoting *Restatement of Torts,* § 729 (1938)); *Coherent*, 736 F.Supp. at 1063–64.

Birtcher argued that Beacon's use of the terms "Argon Beam Coagulator," "Argon Beam," and "Beam" violated the Lanham Act and the Colorado deceptive trade practices act even if the terms are generic, or descriptive without secondary meaning. There is sufficient variation between the terms and phrases as to be dissimilar as a matter of law. Further, the evidence was insufficient to show Beacon's malintent in adopting its designations. I conclude that Birtcher did not carry its burden of showing that consumer confusion is likely. *See Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1260 (5th Cir.1989) (likelihood of confusion reduced where product is expensive, consumers sophisticated and purchases made after evaluation); *Vitek Sys., Inc. v. Abbott Laboratories*, 675 F.2d 190, 193 (8th Cir.1982) (goods prominently carrying their respective house marks reduce likelihood of confusion). Consequently, Birtcher did not establish that it is likely to succeed on its unfair competition claims.

Finally, Birtcher failed to establish that it will suffer irreparable injury without a preliminary injunction. Beacon, however, presented evidence that it would be in serious financial straits if I granted the preliminary injunction.

ACCORDINGLY, IT IS ORDERED that:

Consistent with my Order signed May 18, 1990, plaintiffs' motion for a preliminary injunction is DENIED.